776 So.2d 262 (2001)
PINELLAS COUNTY, Florida, etc., Appellant,
v.
STATE of Florida, et al., Appellees.
No. SC96332.
Supreme Court of Florida.
January 11, 2001.
Joseph A. Morrissey, Assistant County Attorney, Clearwater, FL; and Grace E. Dunlap, Kenneth A. Guckenberger and Randall W. Hanna of Bryant, Miller and Olive, P.A., Tampa, FL, for Appellant.
Bernie McCabe, State Attorney and C. Marie King, Assistant State Attorney, Sixth Judicial Circuit; and Lee Wm. Atkinson of Tew, Zinober, Barnes, Zimmet & Unice, Clearwater, FL, for Appellees.
*263 Robert P. Banks and Leonard Berger, Assistant County Attorneys, West Palm Beach, FL, for The Florida Association of County Attorneys, Amicus Curiae.
LEWIS, J.
We have for review an appeal from the circuit court's order denying validation of Pinellas County's proposed revenue bonds to be used in funding the development of reclaimed water service for selected portions of the County's water service area ("Service Area"). We have jurisdiction pursuant to article V, section 3(b)(2) of the Florida Constitution, and reverse the decision below.

MATERIAL FACTS AND PROCEEDINGS BELOW
Appellant, Pinellas County, Florida (the "County") is a home rule charter county.[1] Pursuant to certain special laws, the County has provided water service to the municipalities of the Pinellas County beaches (including the Beach Cities[2]), for more than sixty years. See generally ch. 29442, Laws of Fla. (1953) (the "1953 Special Act"); ch. 20066, Laws of Fla. (1939) (the "1939 Special Act"); ch. 17644, Laws of Fla. (1935) (the "1935 Special Act") (collectively referred to as the "Special Acts").[3] Under the Special Acts, the County was designated as the provider of water to the Beach Cities and other Pinellas Beaches, which had suffered many failures of small wells. See also Madeira Beach, Fla., Code of Ordinances art. II, ch. 70, §§ 15-201-15-202 (reflecting that the Special Acts gave Pinellas County the authority to construct and operate a nonprofit water system; that such system provides retail water to the Beach Cities; that responsibility for operation "including the right to fix charges or rates for water consumed" has been delegated to the Director of the Water System; and that the Pinellas County Board of County Commissioners is authorized to be the sole and exclusive supplier of potable water to the City of Madeira Beach).
The County's water system currently serves thirteen municipalities within Pinellas County, as well as servicing unincorporated areas, on a retail or direct billing basis[4]. Retail customers in the Service Area (such as the Beach Cities) are directly billed by the County for the water utilized. The record reflects that rates for water service are established by resolution of the Pinellas County Board of County Commissioners (the "Board") pursuant to the Special Acts, and there is no record evidence of any interlocal agreements between the County and the municipalities served.
This controversy began when the County proposed to incorporate into its existing water and sewer facilities a reclaimed water service component (the "RWS"). The RWS would dispose of the system's wastewater in an environmentally acceptable manner, an indispensable element of any water service system. The treated, nonpotable *264 water would be made available to those portions of the Service Area which had been selected, after study, as being best suited for utilization of reclaimed water for irrigation and other non-potable uses.[5] The scope and coverage of any reclaimed water program is necessarily limited because the methodology requires the combination of waste water from approximately four households to produce sufficient reclaimed water for the estimated needs of a single household. The County's enabling ordinance for the program (Ordinance No. 97-103) reflects that it was proposed as a means to minimize the use of existing potable water supplies, to provide a less expensive (and unrestricted) source of water for irrigation, and to recycle wastewater generated from the Service Area. See also Pinellas County Resolution 98-251.
The County proposed to fund the RWS with sewer revenue bonds, and to pledge, as partial security for the bonds, the proceeds to be obtained from a proposed availability charge (or "readiness to serve" charge) (the "Availability Charge"). This charge would apply only to those properties in the Service Area to which the County's new facilities would extend, allowing them to have access to the reclaimed water service. Although highly treated, reclaimed water is not potable and must be delivered through specific water lines. "Transmission lines" carry the reclaimed water from the treatment facilities to the general areas of service. Smaller "distribution lines" then carry the reclaimed water from the transmission lines to individual property owners. From these smaller distribution lines, the County then installs a service stub at individual properties to connect customers to reclaimed water. The proposed Availability Chargeto be amortized over thirty yearswas calculated to cover only a part of the cost of the water distribution lines and the hose bib connections at each property receiving service (and not the cost of transmission lines or of the waste water treatment facility itself, the cost of which would be apportioned to all system users). Once the cost of these lines was recovered, the Availability Charge would no longer be assessed. Those properties having pre-existing wells were to be exempted from reclaimed water service fees, including the Availability Charge. Properties electing to use the reclaimed water would be subject to a connection charge, and fees based upon usage.
Based upon these proposals, the County filed a complaint in circuit court, seeking to validate the Sewer Revenue Bonds. Some of the affected municipalities, asserting that many of their citizens would have no use for the water, opposed validation of the bonds.
The trial court denied the County's request to validate the bonds, on two grounds. First, citing Hodges v. Jacksonville Transportation Authority, 353 So.2d 1211 (Fla. 1st DCA 1977), it found that, pursuant to chapter 153, Florida Statutes, the County was required to obtain the additional consent of the municipalities within the Service Area before adding this reclaimed water system to the existing water services (which it had not done). Second, citing State v. City of Port Orange, 650 So.2d 1 (Fla.1994), it held that the proposed $7 monthly Availability Charge was neither a connection charge nor a user fee; rather, it was an impermissible tax.
We reverse the final judgment entered by the trial court denying the County's complaint for bond validation for two reasons. First, we hold that the County, which was authorized by its home rule charter powers and the Special Acts[6] to *265 add reclaimed water improvements to its existing water and sewer system, was not required to comply with additional requirements of chapter 153, Florida Statutes, where it neither relied, nor was required to rely, upon such supplemental authority. Second, we conclude that the Availability Charge is not an impermissible tax, but a valid fee.

ANALYSIS
This Court's scope of review in bond validation cases is limited. The only issues for our consideration are: (1) whether the public body has the authority to issue the bonds; (2) whether the purpose of the obligation is legal; and (3) whether the bond issuance complies with the requirements of the law. See Poe v. Hillsborough County, 695 So.2d 672, 675 (Fla.1997).

Requirement to Comply with Chapter 153
The record and evidence fail to support the trial court's conclusions, and the applicable law compels reversal. In our view, chapter 153 is clear and unequivocal in providing that its authority and application are supplemental to, and do not invalidate, other sources of authority for undertaking the activities authorized by the statutory provisions. See § 153.20, Fla.Stat. (1997). Review of the applicable resolutions and ordinance in this case reflects that the County did not invoke, nor did it need to invoke, chapter 153 in attempting to extend its reclaimed water service into the Beach Cities. Hodges is distinguishable, and we believe Mountain v. Pinellas County, 152 So.2d 745 (Fla. 2d DCA 1963), is on point.
In Hodges, the Jacksonville Transportation Authority (JTA), exercising its power of eminent domain, filed a complaint for condemnation seeking to obtain a right-of-way needed to construct a limited access highway. Property owners located in the City of Jacksonville opposed the complaint on the ground, inter alia, that there had been no compliance with section 338.01, Florida Statutes, requiring municipal consent for the construction of certain limited access highways. The JTA did not contend that it was not proceeding pursuant to, or bound by the requirements of, section 338.01. Rather, it successfully urged before the trial court that other instruments executed by the City of Jacksonville containing references to construction of the proposed highway on the subject property sufficiently evinced municipal consent and, therefore, compliance with the statute had been established. The appellate court disagreed, stating that its examination of those documents revealed that they did not meet the test to establish consent. The appellate court further observed, however, that the record reflected that a resolution had been introduced in the City Council of the municipality which, if adopted, would comply with the statute. On that basis, the appellate court stated that it did not "hold that the proceeding must be dismissed for failure to obtain timely consent but only that it must be abated until that event has occurred." 353 So.2d at 1212-1213.
Mountain, on the other hand, involved an issue virtually identical to that presented *266 here: whether the County could rely on sources of authority other than chapter 153 in constructing its water system, rather than proceeding under chapter 153 and complying with all provisions contained therein. In holding that the County was not limited by or compelled to follow the requirements of chapter 153, the Mountain court recognized that chapter's expressly supplemental character. Where not invoked, its provisions and restrictions need not be followed. Cf. City of Boca Raton v. State, 595 So.2d 25, 29 (Fla.1992) (holding that the city was not bound to follow the requirements of chapter 170, Florida Statutes, which reflected that it provided a "supplemental, additional and alternative method of procedure" for levying special assessments, in constructing certain downtown infrastructure improvements and funding them through bonds financed by special assessments).[7] Because the County was not required to and did not invoke chapter 153 as authority to extend reclaimed water service into the Beach Cities, the trial court reversibly erred in finding that the County was bound by, and violated, the requirements of chapter 153.

Character of Availability Charge
Recently, this Court had the occasion to address, at length, the character of a valid user fee as compared with a tax in fee's clothing. See Collier County v. State, 733 So.2d 1012 (Fla.1999). Collier County involved a rather transparent attempt by a local government to collect ad valorem taxes on those properties which, because of improvements not substantially complete on January 1 of a given tax year, have historically escaped tax liability for up to twenty-seven months after completion of the improvements. See § 192.042(1), Fla. Stat. (1999). Because the County was, nonetheless, required to provide essential governmental services to these properties, Collier Countyendeavoring to recoup this alleged "windfall" from the affected property ownerspassed an ordinance establishing an "interim governmental services fee" applicable to these properties. As stated in this Court's Collier opinion:
The purpose of the fee is to provide the equivalent of a partial year assessment of ad valorem taxes on improvements to property substantially completed after January 1 that would not otherwise be subject to ad valorem taxation at its new increased value. However, the County stresses that the assessment is not based on the value of the property, but rather on the increased cost of providing certain "growth-sensitive" services as a result of the improvement.
. . . .
The government growth-sensitive services funded by the fee are: (1) the Office of the Sheriff; (2) elections; (3) code enforcement; (4) courts and related agencies; (5) animal control; (6) libraries; (7) parks and recreation; (8) *267 public health; (9) medical examiner; (10) public works; and (11) support services. The County admits that these are the exact services funded through the general revenue fund from ad valorem taxes that all property tax payers are required to support.
Collier County, 733 So.2d at 1015-16 (footnote omitted).
Not surprisingly, even though Collier County presented expert testimony to the effect that the "fee" had been calculated based upon an elaborate formula which excluded "fixed" governmental costs not impacted by improvements to property, this Court rejected the county's characterization of the charge as anything other than a tax. In Collier County, the services supported by the fee were admittedly the same services otherwise paid for through ad valorem tax funds. In analyzing why the "interim governmental services fee" was not a valid user fee, we reasoned:
The County's ordinance includes a "savings clause" providing for the collection of the same amount of money as a fee upon the issuance of the certificate of occupancy, if the uniform method of collection is declared invalid. However, a change in the method of collection will not convert a prohibited tax into a valid fee. As we stated in City of Port Orange, [650 So.2d 1 (Fla.1994),] the power "to tax should not be broadened by semantics which would be the effect of labeling what the City is here [attempting to collect] a fee rather than a tax." 650 So.2d at 3.
In City of Port Orange, this Court found an alleged "transportation utility fee" to actually be an impermissible tax. In that case, the City sought to levy a fee on property owners to support the operation, maintenance and improvement of the local road system. See id. at 2. We explained that user fees are "charged in exchange for a particular governmental service which benefits the party paying the fee in a manner not shared by other members of society." Id. at 3 (emphasis supplied). In that aspect, user fees are similar to special assessments, in that the fee must result in a benefit not shared by persons not required to pay the fee.
. . . .
As explained above, the services to be funded by the "Interim Government Services Fee" provide no direct benefit to the property. Those paying the fee are not benefitted by the services provided in a manner not shared by those not paying the fee. Instead, the services to be funded by the fee are the same general police-power services provided to all County residents. Moreover, the fee would not provide the source for any capital improvements to the County's existing facilities, but instead would defray the operating costs for the County to exercise its sovereign functions. Just as the fee fails to meet the requirements of a special assessment, so does it fail to qualify as a valid fee.
Collier County, 733 So.2d at 1018-19.
Applying this same Port Orange analysis here, in contrast, even though the respondent cries "tax," the Availability Charge has all of the earmarks of a valid utility facilities user fee. In Port Orange, we noted that user fees "are charged in exchange for a particular governmental service which benefits the party paying the fee in a manner not shared by other members of society." Port Orange, 650 So.2d at 3. Here, there is no question that the Availability Charge provides a special benefit to those paying the fee: unlimited access to reclaimed water for non-potable, outdoor uses, such as irrigation and washing activities. Rather than going into the general fund, the money which is recouped through the Availability Charge is tied directly to payment for reclaimed water distribution line improvements extending to the individual properties (not transmission lines to other parts of the county), and collection of the charge ceases when those costs have been recovered. Further, those *268 paying the fee receive unlimited access to reclaimed water, a benefit which is not shared by persons not required to pay the fee. See Collier County v. State, 733 So.2d 1012, 1018 (Fla.1999). These are not the indicia of a tax.
Nonetheless, the trial court erroneously concluded that a "voluntary user fee would permit those who choose to use the reclaimed water to pay for the service and would not indiscriminately burden those property owners who have no need or desire to use reclaimed water." This focus was too narrow. There is no question that the Beach Cities voluntarily receive water service from the County, and nothing in the record evidences their desire to stop receiving such service. While it is true that only certain customers may have access to the necessarily limited quantities of reclaimed water, and that these customers, therefore, pay a portion of the distribution line costs attributable to this special benefit, that is not dispositive of the question. It is clear that the reclaimed water system is an integrated part of the whole water service system, and the remainder of the system costs, not attributable to provision of this special benefit, are borne by all users of the system.[8] Absent a valid interlocal agreement which would allow the Beach Cities to pick and choose between integral components of the water system through which they are provided this essential water service, the "voluntary choice" was made by all customers within the served municipalities when they opted either to receive the integrated water service or not.[9]See supra note 6.
Further, where a governmental entity provides access to traditional utility services,[10] this Court has not hesitated to uphold local ordinances imposing mandatory fees, regardless of whether an individual customer actually uses or desires the service.[11]See Stone v. Town of Mexico *269 Beach, 348 So.2d 40 (Fla. 1st DCA 1977) (finding that a mandatory flat rate for garbage service, regardless of use, was not contrary to constitutional standards); State v. City of Miami Springs, 245 So.2d 80 (Fla.1971) (ruling that a flat rate for sewer charges for all single family residences, unrelated to actual use, was not unreasonable, arbitrary or in conflict with state or federal constitutions or law); see also Riviera Beach v. Martinique 2 Owners Ass'n, 596 So.2d 1164 (Fla. 4th DCA 1992) (holding that the subject solid waste removal ordinance applied to unoccupied condominiums without regard to actual use); Town of Redington Shores v. Redington Towers, Inc., 354 So.2d 942 (Fla. 2d DCA 1978) (holding that mandatory sewer charges against unoccupied property applied from the date the sewer main was available to be used, and that sewage charges were reasonably related to the value of service rendered either as actually consumed or as readily available).[12] Because the Availability Charge has the characteristics of a valid fee, the trial court erred in determining it to be an invalid tax. Based upon the foregoing, we vacate the order denying the complaint for bond validation, and remand this case to the trial court with directions to enter a judgment validating the bonds.
It is so ordered.
WELLS, C.J., and SHAW, HARDING, ANSTEAD, PARIENTE and QUINCE, JJ., concur.
NOTES
[1] The County's home rule charter was established by chapter 80-590, section 1, Laws of Florida, and made effective by an approving referendum held on October 7, 1980.
[2] Madeira Beach and Indian Rocks Beach are referred to collectively herein as the "Beach Cities." They are joined by appellees James Palamara, Robert Johnson, Fred Vowinkel, Marsha Loper and John DeMont The Beach Cities are two of a string of municipalities that form the barrier islands of Pinellas County. The water service territory included by the Special Acts included "that certain chain of islands bordering on the Gulf of Mexico from Pass-A-Grille to Indian Rocks." Of the eight beach municipalities that the County is proposing to serve with reclaimed water, only the two Beach CitiesMadeira Beach and Indian Rocks Beachobject to validation of the bonds.
[3] The Special Acts are incorporated into the Pinellas County Code at sec. 126-121.
[4] The record reflects that the County also serves five municipalities with water on a wholesale basis, where the contracting municipalities bill the customers according to fee schedules set by the municipalities.
[5] The reclaimed water supply is designed to be used for items such as lawn and garden irrigation, vehicle washing and other nonpotable uses. This also provides a corresponding reduction in the demand for potable water, a water conservation measure.
[6] The authority, under the Special Acts, for the County to assess charges for the County's Water System includes the power to assess fees for water services and facilities, and for mandatory hook-ups to such facilities. Section 4 of the 1953 Special Act ("Powers of the County") provides, in pertinent part, that the County shall have the power:

(4) To prescribe, fix, establish and collect fees, rentals or other charges for the facilities and services furnished by such water system, or any part thereof, either heretofore or hereafter constructed or acquired on an equitable basis; provided, however, that such fees, rentals or other charges, or any revision thereof, shall be fixed and established by Resolution of the Board of County Commissioners in said County.
. . . .
(8) To require all lands, buildings and premises to use the facilities and services of such undertakings, except as herein otherwise noted, in all cases deemed necessary or desirable by the county.
(Emphasis supplied.)
[7] The County's second argumentthat the Beach Cities, by consenting to the County's provision of water to them, have thereby consented to construction, operation and maintenance of all lawful components of that system need not be reached, but is (as a matter of public policy) also compelling. Environmentally sound programs are often the most costly components of essential local governmental service systems, whether those systems involve electric utilities, water and sewer facilities, or garbage disposal services. Absent a valid interlocal compact providing otherwise, where special laws require a county to provide water service to a municipality, that municipality should not be permitted to "cherry-pick" one system component and reject another component, especially where, as here, the Legislature has encouraged such component as part of an integrated water system. See generally § 373.250, Fla.Stat. (1997) (providing that the "encouragement and promotion of water conservation and reuse of reclaimed water ... are state objectives considered to be in the public interest"); § 403.064(8), Fla.Stat. (1997) (providing that local governments "may and are encouraged to implement programs for the reuse of reclaimed water"); § 403.064(9), Fla.Stat. (1997) (providing that a "local government that implements a reuse program under this section shall be allowed to allocate the costs in a reasonable manner").
[8] While the reclaimed water project in its entirety may be indispensable to continued provision of potable water to all customers in the system (because it provides an environmentally acceptable disposition of system waste water), only that portion of project improvements attributable to distribution lines going to individual properties having access to the limited supply of available reclaimed water will be included in the Availability Charge. Indeed, because of the additional benefit which those properties will receive, had the County adopted the allocation which the State and Beach Cities urge (charging the entire cost of the reclaimed water service, including individual distribution lines, to all water system customers), it would have been suspect. Cf. Sarasota County v. Sarasota Church of Christ, Inc., 667 So.2d 180, 182 (Fla.1995) (observingin the context of a similar challenge levied against certain stormwater management special assessments (rather than user fees)that, where the County's assessments against certain properties were reasonably related to the treatment of polluted stormwater contributed by those properties, "[t]o require that the stormwater utility services be funded through a general ad valorem tax, as requested by the religious organizations who filed this action, would shift part of the cost of managing the stormwater drainage problems, which are created by developed real property, to undeveloped property owners who neither significantly contributed to nor caused the stormwater drainage problems").
[9] However, the Reclaimed Water Ordinance does permit residents to opt out of the Availability Charge if they have an irrigation well on their property.
[10] The nexus between water systems and sewer systems makes them equivalent for purposes of construing applicable fees. Cf. State v. City of Miami, 157 Fla. 726, 736-37, 27 So.2d 118, 124 (1946) (observing, in the context of affirming the validation of sewer revenue bonds, that "[a] sewer system is complementary to a water system ... so the principles of law which would apply to one system must likewise apply to the other" ).
[11] There is ample authority under Florida's statutory law for local governments to recoup the costs of providing water service in general, and reclaimed water service in particular. See § 153.12, Fla.Stat. (1997) (providing that counties may, upon construction of a sewage disposal system and the financing of such a system by the issuance of sewer revenue bonds, require that each lot or parcel of land within the county which abuts upon a street or other public way containing sanitary sewer connect to such sewer); § 180.02(3), Fla.Stat. (1997) (providing that municipalities have the power to create a zone or area by ordinance and to require all persons or corporations living in or doing business within that area to connect, when available, to any sewerage system or alternative water supply system, including, but not limited to, reclaimed water); § 373.309, Fla.Stat. (1997) (providing requirements for mandatory connection to available potable water systems in areas of known contamination); § 381.0065, Fla.Stat. (1997) (providing that connections to on-site sewage and disposal systems are only allowed when service is not available from a publicly-owned or private sewage system); § 381.00655, Fla.Stat. (1997) (providing that property owners must connect to available sewer systems within a specified time); § 403.031(17), Fla.Stat. (1997) (providing that storm water management programs are to be operated "as a typical utility which bills services regularly, similar to water and wastewater services"); §§ 403.064(8)-(9), Fla.Stat. (1997) (encouraging local governments to implement programs for the reuse of reclaimed water, and providing that governments implementing such programs "shall be allowed to allocate the costs in a reasonable manner").
[12] Similar cases from other states likewise support the conclusion that the Availability Charge is an appropriate fee. See Lepre v. D'Iberville Water & Sewer Dist., 376 So.2d 191, 194 (Miss.1979) (upholding mandatory "readiness to serve" charge regardless of property's connection to water and sewer system, and specifically finding that the charge was not a tax); Airwick Indus., Inc. v. Carlstadt Sewerage Auth., 57 N.J. 107, 270 A.2d 18 (1970) (approving sewer fees to improved and unimproved properties); McMillan v. Texas Natural Resources Conservation Comm'n, 983 S.W.2d 359, 365 (Tex.Ct.App.1998) (holding that annual "standby fees" imposed for availability of potable water, sanitary sewer or drainage facilities and services to undeveloped property were not taxes, because they were "not equally distributed, but instead [were] imposed only on property that can take advantage of available benefits").