778 So.2d 519 (2001)
CITY OF GAINESVILLE, Appellant,
v.
STATE of Florida, DEPARTMENT OF TRANSPORTATION, Appellee.
No. 1D99-4548.
District Court of Appeal of Florida, First District.
March 5, 2001.
*520 Marion J. Radson, City Attorney, and Elizabeth A. Waratuke, Litigation Attorney, Office of the City Attorney, Gainesville, for Appellant.
Pamela S. Leslie, General Counsel, and Gregory G. Costas, Assistant General Counsel, Florida Department of Transportation, Tallahassee, for Appellee.
C. Allen Watts of Cobb, Cole & Bell, Daytona Beach, for Amicus Curiae Florida Association of Stormwater Utilities.
James R. English, City Attorney, and Linda R. Hurst, Assistant City Attorney, Tallahassee, for Amicus Curiae City of Tallahassee.
O. Earl Black, Jr., Assistant General Counsel, Department of Management Services, *521 Tallahassee, for Amicus Curiae State of Florida Department of Management Services.
BENTON, J.
The City of Gainesville (City) filed a complaint seeking a judgment declaring that the stormwater utility charges the City has billed the Department of Transportation (DOT) on account of its property at 2006 N.E. Waldo Road were valid utility fees, and requiring DOT to pay the fees. By amended final judgment of dismissal, the trial court dismissed the City's amended complaint against DOT, ruling that the ordinance authorizing the stormwater utility charges, sections 27-236-27-244, Gainesville Code (1998), imposed special assessments the City could not collect from a state agency, and did not authorize utility fees. We reverse as to the declaratory judgment, and affirm dismissal of the damages count, but conclude that dismissal of that count with prejudice was premature, and remand for further proceedings consistent with this opinion.

I.
Count one of the amended complaint seeks a declaratory judgment that the City's stormwater utility charge is a valid utility fee. In conformity with the ordinance, the amended complaint alleges, the City has regularly billed DOT for stormwater management utility services. The amended complaint alleges that the City bills stormwater utility fees monthly along with charges for electricity, gas, water and wastewater utilities; that the stormwater utility ordinance does not create or purport to create a lien on property served; and that the City may collect delinquent charges by engaging a collection agency or, as in the present case, by filing a lawsuit itself. See § 27-244(d), Gainesville Code (1998).
Attached to the amended complaint, the City's ordinance requires charges "based on the cost of providing stormwater management services to all properties within the city [which] may be different for properties receiving different classes of service." § 27-241(a), Gainesville Code (1998). The ordinance provides that stormwater management service charges are to be computed using equivalent residential units (ERUs) of 2,300 square feet, a figure which represents "the estimated average impervious area for all developed, detached single-family properties in the city." Id. § 27-237. Service charges for commercial property are computed by measuring the amount of developed, impervious square footage on the property, dividing by 2,300, and multiplying the number of ERUs by an ERU rate. See id. § 27-241(b)(3).
Undeveloped property is exempt, see id. § 27-241(b)(5), as is property which does not contribute runoff to the Gainesville stormwater management system. See id. § 27-241(b). By retaining stormwater on site, a property owner may earn "retention credits" which reduce the amount of the fee, and may, by retaining all stormwater attributable to development on site, avoid paying the fee altogether. See id. §§ 27-237, 27-241(b)(3). The administrative complaint alleges that stormwater utility fees the City collects are segregated and used only for stormwater management purposes. Count two alleges that DOT has refused to pay the fees, and seeks judgment against DOT for the unpaid charges.
In its motion to dismiss amended complaint, DOT takes the position that DOT's status as a state agency precludes liability because "[a]s a matter of law the stormwater fee is a tax or special assessment." DOT's motion to dismiss asserts that "[s]ince there is no law specifically allowing the City of Gainesville to impose such tax or special assessment against the State of Florida, the Department may not be charged the stormwater fee." But the City does not contend that state property can be taxed, or that state property can be specially assessed, absent a statute authorizing special assessments specifically on state property, either explicitly or by "necessary *522 implication." Blake v. City of Tampa, 115 Fla. 348, 156 So. 97, 99 (1934). The City does not question the rule that legislative intent to sanction special assessments on state property must "clearly appear[] from the statute." Edwards v. City of Ocala, 58 Fla. 217, 50 So. 421, 422 (1909). At issue is whether the utility fee is a user fee, as the City contends, rather than either a tax or a special assessment, as DOT contends.
Dismissing both counts of the amended complaint, the circuit court ruled that the amounts the City collects from property owners for stormwater runoff management and treatment must be deemed, as a matter of law, not fees for utility services, but special assessments which cannot be enforced against a state agency like DOT. Special assessments are, to be sure, one statutorily authorized means for financing construction of municipal stormwater management systems.[1]See Sarasota County v. Sarasota Church of Christ, Inc., 667 So.2d 180, 186-87 (Fla.1995). At issue in the present case, however, is whether the City can, as the amended complaint alleges it has in fact done, employ another statutorily authorized means of financing a stormwater management system, viz., the creation of a stormwater utility and the adoption of stormwater utility fees. See § 403.0893(1), Fla.Stat. (2000).

II.
Whether a complaint should be dismissed is a question of law. On appeal of a judgment granting a motion to dismiss, the standard of review is de novo. See Andrews v. Florida Parole Comm'n, 768 So.2d 1257, 1260 (Fla. 1st DCA 2000); Rittman v. Allstate Ins. Co., 727 So.2d 391, 393 (Fla. 1st DCA 1999) ("The sufficiency of a complaint in a civil action is a question of law."); Sarkis v. Pafford Oil Co., 697 So.2d 524, 526 (Fla. 1st DCA 1997); Troupe v. Redner, 652 So.2d 394, 395 (Fla. 2d DCA 1995). For purposes of ruling on the motion to dismiss, the trial court was obliged to treat as true all of the amended complaint's well-pleaded allegations, including those that incorporate attachments, and to look no further than the amended complaint and its attachments. See Brewer v. Clerk of the Circuit Court, 720 So.2d 602, 603 (Fla. 1st DCA 1998); Sarkis, 697 So.2d at 526; Varnes v. Dawkins, 624 So.2d 349, 350 (Fla. 1st DCA 1993). "A reviewing court operates under the same constraints. See Rittman, 727 So.2d at 393; McKinney-Green, Inc. v. Davis, 606 So.2d 393, 394 (Fla. 1st DCA 1992)." Andrews, 768 So.2d at 1260. "[A] court's gaze is limited to the four corners of the complaint, including the attachments incorporated in it, and all well pleaded allegations are taken as true. See, e.g., Provence v. Palm Beach Taverns, Inc., 676 So.2d 1022 (Fla. 4th DCA 1996)." Alevizos v. John D. and Catherine T. MacArthur Found., 764 So.2d 8, 9 (Fla. 4th DCA 1999).

III.
On the merits, the threshold question is whether Florida law allows a city *523 to collect utility fees for managing stormwater runoff. We answer this threshold question in the affirmative. The Florida Constitution grants municipalities "governmental, corporate and proprietary powers to enable them to ... render municipal services" and the right to "exercise any power for municipal purposes except as otherwise provided by law." Art. VIII, § 2(b), Fla. Const. See § 166.021(1), Fla. Stat. (2000); Contractors and Builders Ass'n v. City of Dunedin, 329 So.2d 314, 319 (Fla.1976); City of Miami Beach v. Fleetwood Hotel, Inc., 261 So.2d 801, 803 (Fla.1972). By special act, the Legislature has expressly granted the City full power and authority to provide public utility services of all kinds. Ch. 90-394, § 1, at 23, Laws of Fla. (amending the charter of the City of Gainesville, and providing in Article I, section 1.04(2), that the city may "own, operate, or lease local public utilities, including: ... wastewater and stormwater facilities"). "Implicit in the power to provide municipal services is the power to construct, maintain and operate the necessary facilities." Cooksey v. Utilities Comm'n, 261 So.2d 129, 130 (Fla.1972).
Acknowledging the importance of managing and treating the state's stormwater runoff, the Legislature mandated some fifteen years ago that the Department of Environmental Regulation assess the efficacy of stormwater management programs then in existence. See Ch. 86-186, § 15, at 1349, Laws of Fla. Later, the Legislature directed local governments to work in conjunction with the Department to develop stormwater management programs. See Ch. 89-279, § 32, at 1626-27, Laws of Fla. (codified at § 403.0891, Fla.Stat. (1989)). Eventually, a statute was enacted which, like the constitution, antecedent general law, and the special act, authorizes the City to construct, operate and finance a stormwater management utility. See § 403.0891, Fla.Stat. (2000) ("[L]ocal governments shall have the responsibility for the development of ... stormwater management programs.").
Pertinent here is statutory authorization for local governments to "[c]reate one or more stormwater utilities and adopt stormwater utility fees sufficient to plan, construct, operate, and maintain stormwater management systems." § 403.0893(1), Fla.Stat. (2000). "The imposition of fees for the use of a municipal utility system is not an exercise of the taxing power nor is it the levy of a special assessment." City of Dunedin v. Contractors and Builders Ass'n, 312 So.2d 763, 766 (Fla. 2d DCA 1975) (citing State v. City of Miami, 157 Fla. 726, 27 So.2d 118 (1946)), quashed on other grounds, 329 So.2d 314 (Fla.1976). The statute defines creating a "stormwater utility" as "funding of a stormwater management program by assessing the cost of the program to the beneficiaries based on their relative contribution to its need. It is operated as a typical utility which bills services regularly, similar to water and wastewater services." § 403.031(17), Fla. Stat. (2000).
These statutes make very clear that municipalities have the option of establishing stormwater management systems as traditional utilities and financing them by collecting utility fees. Accord City of Cocoa v. School Bd. of Brevard County, 711 So.2d 1322, 1323 (Fla. 5th DCA 1998) ("[T]he legislature appears to have intended to create a stormwater `utility' akin to water or sewer service."). See also Pinellas County v. State, 776 So.2d 262, 268 n. 11 (Fla.2001) (referring to stormwater utilities as among "traditional utilities" and citing "§ 403.031(17), Fla. Stat. (1997) (providing that storm water management programs are to be operated `as a typical utility which bills services regularly, similar to water and wastewater services')"); State v. City of Port Orange, 650 So.2d 1, 4 (Fla.1994) (noting that "storm-water utility fees are expressly authorized by section 403.031, Florida Statutes (1993)").

IV.
DOT argues that the decision in Port Orange supports its contention that the *524 charges the City seeks to collect from DOT are not utility fees. Deciding in Port Orange that purported "transportation utility fees" the city sought to levy amounted in law to an unauthorized ad valorem tax on property, our supreme court said:
In City of Boca Raton v. State, 595 So.2d 25 (Fla.1992), this court noted that a tax is an enforced burden imposed by sovereign right for the support of the government, the administration of law, and the exercise of various functions the sovereign is called on to perform. Klemm v. Davenport, 100 Fla. 627, 631, 129 So. 904, 907 (1930). Funding for the maintenance and improvement of an existing municipal road system, even when limited to capital projects as the circuit court did here, is revenue for exercise of a sovereign function contemplated within this definition of a tax.
User fees are charges based upon the proprietary right of the governing body permitting the use of the instrumentality involved. Such fees share common traits that distinguish them from taxes: they are charged in exchange for a particular governmental service which benefits the party paying the fee in a manner not shared by other members of society, National Cable Television Assn. v. United States, 415 U.S. 336, 341, 94 S.Ct. 1146, 1149, 39 L.Ed.2d 370 (1974); and they are paid by choice, in that the party paying the fee has the option of not utilizing the governmental service and thereby avoiding the charge. Emerson College v. City of Boston, 391 Mass. 415, 462 N.E.2d 1098, 1105 (1984) (citing City of Vanceburg v. Federal Energy Regulatory Comm'n, 571 F.2d 630, 644 n. 48 (D.C.Cir.1977), cert. denied, 439 U.S. 818, 99 S.Ct. 79, 58 L.Ed.2d 108 (1978)). The above concept of user fees was approved by this Court in City of Daytona Beach Shores v. State, 483 So.2d 405 (Fla.1985). The City's transportation utility fee falls within our definition of a tax, not our definition of a user fee.
City of Port Orange, 650 So.2d at 3. Here DOT argues that Gainesville's ordinance does not impose user fees because the party paying the fee does not have the option to refuse the service, and because the fee is not charged "in exchange for a particular governmental service which benefits the party paying the fee in a manner not shared by other members of society." City of Port Orange, 650 So.2d at 3. But DOT's arguments do not square with the City's well-pleaded allegations.

A.
While the amended complaint alleges that the "stormwater fee applies to all properties within the City using or benefitting from the system, including all buildings and properties owned by the City and all other governmental entities," it also alleges that the "City's ordinance does not impose any charge on undeveloped and unaltered land" and that "[d]eveloped land is charged only to the extent that it contributes stormwater to the stormwater utility system." Under these allegations, a landowner does have the option to refuse stormwater management services and so avoid any fees either by refraining from developing the land or, if the land has been developed, by preventing runoff from leaving the property or, as the amended complaint further alleges, by assuring that "stormwater runoff from the site does not impact stormwater utility services.... An example would be property located on the edge of the City [from] which runoff drains to property outside the City." Just as DOT could haul its own solid waste to the landfill itself, dig its own well, or generate its own electricity, it could construct swales, berms, retention ponds and the like to contain all stormwater runoff on its own property and thereby, according to the allegations of the amended complaint, avoid Gainesville's stormwater utility fees.
The unavoidable "transportation utility fee" at issue in Port Orange was different in this respect. See City of Port *525 Orange, 650 So.2d at 4 ("The Port Orange fee ... is a mandatory charge imposed upon those whose only choice is owning developed property within the boundaries of the municipality."). Here, the allegations are that Gainesville's ordinance does provide options for the self-sufficient landowner. Because a landowner can refuse the City's stormwater utility service and prevent liability for stormwater utility fees by containing runoff, the fees are neither a tax nor a special assessment.

B.
As for DOT's claim that the City's stormwater utility fees do not correlate exactly with the benefits each individual user of the service receives, we note that the City attempted, by attaching documents to a memorandum in opposition to DOT's motion to dismiss the amended complaint, to bring to the court's attention billing records showing how, in practice, fees for use of the stormwater management system were billed. On DOT's motion, the trial court struck these documents as having no role to play in consideration of the motion to dismiss. The propriety of this ruling is not in question. But the amended complaint's well-pleaded allegations plainly do not establish DOT's contention that the City's fee schedule renders the ordinance defective.
The amended complaint alleges that charges are "`based on the cost of providing stormwater management services to all properties within the city and may be different for properties receiving different classes of service.'" Stormwater runoff, of course, like wastewater and solid waste, cannot feasibly be metered; it differs from potable water, gas and electricity, in this regard. But the amended complaint incorporates the ordinance which sets out the City's equivalent residential unit methodology in some detail. The amended complaint also alleges compliance with authorizing statutes generally. The City is entitled to a chance to prove that its ordinance "assess[es] the cost of the program to the beneficiaries based on their relative contribution to its need ... [and] operate[s] as a typical utility which bills services regularly, similar to water and wastewater services." § 403.031(17), Fla. Stat. (2000).
In setting utility rates, moreover, municipalities enjoy a certain latitude. See State v. City of Miami, 157 Fla. 726, 27 So.2d 118, 125 (1946) ("It is City Council's duty to decide upon the rate, and we cannot set it aside unless it is clearly inequitable.").
In Florida, it is a well recognized principle of law that rate-setting for municipal utilities is a legislative function to be performed by legislative bodies like local municipal governments and the commissions to which these bodies delegate such authority. Cooksey v. Utilities Comm'n., 261 So.2d 129 (Fla.1972); Cooper v. Tampa Electric Co., [154 Fla. 410, 17 So.2d 785 (1944) ]; Southern Utilities Co. v. City of Palatka, 86 Fla. 583, 99 So. 236 (1923). Our courts will intervene to strike down unreasonable or discriminatory public utility service rates prescribed by the Legislature, a municipality, or municipal commission; however, courts will not themselves fix prospective rates. See Cooper v. Tampa Electric Co., supra, and Tampa Electric Co. v. Cooper, 153 Fla. 81, 14 So.2d 388 (1943).
Mohme v. City of Cocoa, 328 So.2d 422, 424-25 (Fla.1976). A city may charge different rates to different classes of utility users so long as the classifications are not arbitrary, unreasonable or discriminatory. See City of New Smyrna Beach v. Fish, 384 So.2d 1272, 1274-76 (Fla.1980) (upholding solid waste ordinance against claim it discriminated against condominium dwellers); State v. City of Miami Springs, 245 So.2d 80 (Fla.1971) (upholding sewer ordinance setting a flat rate for single family residences and a variable rate based on use for all other users).
With respect to the setting of utility rates by municipalities, 12 McQuillin, *526 Municipal Corporations (3rd Ed.1970), § 35.37b states:
"`A municipality has the right to classify consumers under reasonable classifications based upon such factors as the cost of service, the purpose for which the service or the product is received, the quantity or the amount received, the different character of the service furnished, the time of its use or any other matter which presents a substantial difference as a ground of distinction. Accordingly, a lack of uniformity in the rate charged is not necessarily unlawful discrimination. The establishment of classifications and the charging of different rates for the several classes is not unreasonable and does not violate the requirements of equality and uniformity. Discrimination to be unlawful must draw an unfair line or strike an unfair balance between those in like circumstances having equal rights and privileges. Discrimination with respect to rates charged does not vitiate unless it is arbitrary and without a reasonable fact basis or justification.'"
Pinellas Apartment Ass'n, Inc. v. City of St. Petersburg, 294 So.2d 676, 677-78 (Fla. 2d DCA 1974). The use of "equivalent residential units" for stormwater utility billing purposes was mentioned with apparent approval in Atlantic Gulf Communities Corp. v. City of Port St. Lucie, 764 So.2d 14, 15 (Fla. 4th DCA 1999) (noting "that the typical residential lot had 11,745 square feet of total area and that the typical home on such lot has 2,280 square feet of impervious surface area"). See also Smith Chapel Baptist Church v. City of Durham, 350 N.C. 805, 517 S.E.2d 874, 881-82 (1999); Twietmeyer v. City of Hampton, 255 Va. 387, 497 S.E.2d 858, 860-61 (1998); Teter v. Clark County, 104 Wash.2d 227, 704 P.2d 1171, 1179 (1985). A flat rate for single family homes and a variable rate for commercial establishments is consistent with the holding in State v. City of Miami Springs.

V.
The boundary between special assessments and user fees is not always clear. See, e.g., Harris v. Wilson, 656 So.2d 512 (Fla. 1st DCA 1995) (upholding special assessments levied to finance residential solid waste disposal); Charlotte County v. Fiske, 350 So.2d 578 (Fla. 2d DCA 1977) (same). Charges for required sewer hookups, which may be said to confer a benefit on the connected property, are considered user fees. See, e.g., City of Dunedin, 329 So.2d at 316 n. 1.
In determining whether a charge for connecting property with the municipal water service is a "fee" or an "assessment," the name given to the charge is not controlling; it is the reason for the charge which controls its nature, and if it is a charge made for the improvement of a certain piece of property, it is an assessment. Similarly, charges for connection to or the use of a sewer generally are not deemed taxes.
There is no bright-line test for distinguishing between a connection/use fee and a special assessment; generally, a "fee" is exchanged for a service rendered or a benefit conferred, and some reasonable relationship exists between the amount of the fee and the value of the service or benefit, while a "special assessment" is a specific levy designed to recover the costs of improvements that confer local and peculiar benefits upon property within a defined area. "User fees" are those which are charged only to the person actually using the service, and the amount of the charge generally is related to the actual goods or services provided and is a monthly charge rather than a one-time charge.
Laura H. Dietz, Am.Jur.2d, Special or Local Assessments § 2, at 631-32 (2000) (footnotes omitted). Our supreme court has recently indicated, moreover, (albeit in obiter dicta ) in Pinellas County v. State, 776 So.2d 262 (Fla.2001), that whether connection to a utility service is voluntary is not dispositive of whether the connection *527 fee is a user fee or a special assessment.[2] The court said that "where a governmental entity provides access to traditional utility services, this Court has not hesitated to uphold local ordinances imposing mandatory fees, regardless of whether an individual customer actually uses or desires the service." Id. at 268 (footnotes omitted).
The lack of a bright line notwithstanding, we hold that the ordinance at issue here, if it operates as the City has alleged, imposes utility service fees rather than special assessments. "Stormwater runoff is rain ... that does not evaporate or penetrate the ground and is collected by storm drains that transport it to receiving waters." Smith Chapel Baptist Church, 517 S.E.2d at 876. The management and treatment of stormwater runoff confers a benefit on the owner of the land the stormwater runs off of that resembles the benefits solid waste collection and sanitary sewers provide. The objective is to route the water in a way that avoids flooding of other lands and allows the runoff to flow sufficiently slowly through appropriate structures in order that at least some contaminants will precipitate before the runoff reaches receiving waters. Managing stormwater runoff, especially through storm sewers, is closely analogous to managing wastewater. Charges for managing wastewater are routinely deemed user fees. See Missouri Growth Ass'n v. Metropolitan St. Louis Sewer District, 941 S.W.2d 615, 622-25 (Mo.App.Ct.1997) (holding sewer service charge was user fee, after canvassing factors); Opinion of Justices, 93 N.H. 478, 39 A.2d 765, 767 (1944) ("[T]he sewer rents ... are neither taxes nor assessments for a local benefit but, like water rates, ... are charges made for a service rendered...."); State ex rel. Gordon v. Taylor, 149 Ohio St. 427, 79 N.E.2d 127, 131 (1948) ("[I]t is well established that charges for sewer services... are neither taxes nor assessments."); State v. Bartos, 102 Ariz. 15, 423 P.2d 713, 714 (1967) (holding sewer "charges are neither taxes nor assessments").

VI.
DOT suggests that, even if Gainesville's ordinance does create a bona fide utility and authorize valid utility fees, sovereign immunity shields it from liability for the City's fees.[3] Such a claim is reminiscent of the claim made on behalf of the Department of Health and Rehabilitative Services (HRS) in Hillsborough Ass'n for Retarded Citizens v. City of Temple Terrace, 332 So.2d 610 (Fla.1976). It was contended there that HRS, as a state agency enjoying sovereign immunity, and a contractor furnishing residential services on HRS's behalf did not have to abide by municipal zoning ordinances. Rejecting the "superior sovereign test," the Second District adopted a "balancing of interests test to decide the consequences resulting from the exercise of a governmental function by one governmental unit within the geographic limits of a different governmental unit :.. without regard to the fact that one of those governmental units is the state." City of Temple Terrace v. Hillsborough Ass'n for Retarded Citizens, 322 So.2d 571, 579 (Fla. 2d DCA 1975).[4]
*528 Rather than analyzing the governmental interests at stake here, DOT starts with the problematic premise that any obligation it has to pay the City stormwater utility fees is purely contractual in nature. See Williams v. City of Mount Dora, 452 So.2d 1143, 1146 (Fla. 5th DCA 1984) ("In the absence of an applicable and valid statute... liability for payment for utility services is based on usual contract law."). But this overlooks "an applicable and valid statute" making utility users responsible for utility fees.[5]See also Southern Road-builders, *529 Inc. v. Lee County, 495 So.2d 189, 190 n. 1 (Fla. 2d DCA 1986) ("Sovereign immunity is a doctrine designed to protect the public treasury from what would otherwise be countless claims filed by the vast number of citizens affected by the actions of a government." (Emphasis supplied.))
Courts in other jurisdictions have not hesitated to hold that a municipality's authority to set stormwater utility fees includes authority to charge a state agency or board such fees.[6] The Colorado State Board for Community Colleges and Occupational Education (Board) argued in City of Littleton v. State, 855 P.2d 448 (Colo. 1993), that the City of Littleton had no authority to charge the Board a stormwater utility fee. Colorado's intermediate appellate court agreed and concluded that the charges in question amounted to special assessments, just as the circuit court did in the present case. But, after first holding that the charges were valid service fees, see id. at 452, the Colorado Supreme Court held that the statute that granted authority to municipalities to collect utility fees conferred authority to charge state agencies like the Board. See id. at 454-55.
Construing a stormwater management statute similar to Florida's in State v. City of Charleston, 334 S.C. 246, 513 S.E.2d 97 (1999), the South Carolina Supreme Court decided that the state was not exempt from paying stormwater utility fees the City of Charleston charged. The South Carolina statute stated simply:
Authority is granted to local governments to establish a stormwater utility. The stormwater utility may fund such activities as watershed master planning, facility retrofitting, and facility maintenance. This funding shall occur through the establishment of a fee system or tax assessment that must be reasonable and equitable. Criteria for the implementation of the stormwater utility must be established in regulations promulgated under this chapter. The implementation of a stormwater utility will necessitate the adoption of a local utility ordinance prior to its implementation.
S.C.Code Ann. § 48-14-120(C) (Supp. 1998). The South Carolina Supreme *530 Court held that "the plain, ordinary, and unambiguous language of the Act permits the assessment of this fee upon State property.... State owned or managed property is subject to the fee." City of Charleston, 513 S.E.2d at 98 (citations omitted). Similarly interpreting the Florida statutory scheme yields the same commonsense result.
In memoranda of law supporting its motions to dismiss, DOT twice concedes: "Local governments may impose user fees on state property." Responding to DOT's request for advice (a request in which the City later joined), the attorney general opined:
To summarize: City of Gainesville Stormwater Management Utility fees are imposed on property that contributes runoff to the city's stormwater management system and requires use of that system; varying charges for this service are based on the percentage of water generated from the property and not retained on site; property owners may choose to use the system or to contain such runoff on their own property and, if no service is provided to a property, the property is not charged; stormwater utility fees are collected, along with other Gainesville utility fees, by inclusion on a monthly utility bill; delinquent stormwater utility bills, like other city utility bills, are handled by collection procedures and no lien is placed on property for nonpayment of these fees; finally, City of Gainesville Stormwater Utility fees are collected and deposited into a trust fund for uses related to the city's stormwater management utility, and expenditures that are not related to such activities are prohibited.
While a stormwater management utility fee may be imposed as either a special assessment or as a service fee, based on its characteristics it is my opinion that the fee imposed by the City of Gainesville for utilization of the stormwater management utility is a service fee or user fee, which the city may lawfully impose on property of the State of Florida, Department of Transportation.
Op. Att'y Gen.Fla. 97-70 (1997) (footnote omitted). On this record, which does not reveal whether there is a written agreement between DOT and the City, DOT has demonstrated no legal reason for failing to pay the City's charges if, as the City has alleged, the City's ordinance imposes user fees. Accordingly, we reverse as to count one.

VII.
Absent a written agreement, however, a vendor cannot sue the state for money damages on a contract theory. See County of Brevard v. Miorelli Eng'g, 703 So.2d 1049, 1051 (Fla.1997) (deciding case on summary judgment over dissent that court was acting "largely in a factual vacuum"); Pan-Am Tobacco Corp. v. Department of Corrections, 471 So.2d 4, 5-6 (Fla. 1984) (reversing summary judgment). While the present case is an intergovernmental dispute and the charges are authorized by ordinance, private entities may also be authorized by ordinance to furnish utility services. In any event, the City has argued no basis for abrogating the ordinary rule immunizing the state from contract suits where the state has signed nothing. At this stage of the proceedings, however, it is not clear whether or not DOT signed an application for utility services or otherwise entered into a written agreement with the City. The City has made no allegation in this regard.
Our supreme court has held that facts on which a waiver of sovereign immunity depends must be pleaded in the complaint. Levine v. Dade County Sch. Bd., 442 So.2d 210, 213 (Fla.1983); Arnold v. Shumpert, 217 So.2d 116, 120 (Fla.1968) (holding that in "suing a county a plaintiff must allege in his complaint the specific methods by which the county waives its sovereign immunity"). See also Department of Transp. v. White Constr. Co., 452 So.2d 33, 34-35 (Fla. 1st DCA 1984) *531 (recognizing "that conditions precedent in a waiver of sovereign immunity statute must not only be complied with before a suit may be maintained, but also the complaint must specifically allege compliance with the conditions precedent"). Accord Charity v. Board of Regents, 698 So.2d 907, 908 (Fla. 1st DCA 1997); State, Dep't of Transp. v. Bailey, 603 So.2d 1384, 1387 (Fla. 1st DCA 1992); Sebring Utils. Comm'n v. Sicher, 509 So.2d 968, 969 (Fla. 2d DCA 1987); Bryant v. Duval County Hosp. Auth., 502 So.2d 459, 462 (Fla. 1st DCA 1986). Unless the state is estopped to raise the defense, see Bryant, 502 So.2d at 462; City of Pembroke Pines v. Atlas, 474 So.2d 237, 238 (Fla. 4th DCA 1985), the state may raise the plaintiff's failure to plead or prove facts showing sovereign immunity has been waived for the first time even after judgment has been entered. See Charity, 698 So.2d at 908 n. 1; State Dep't of Transp. v. Bailey, 603 So.2d 1384, 1387 (Fla. 1st DCA 1992).
We have specifically rejected the contention "that sovereign immunity[7] is not an appropriate consideration on the motion to dismiss because it is an affirmative defense." Charity, 698 So.2d at 907. Instead, we held "that failure to allege the existence of an express written contract was properly considered on the motion to dismiss." Id. at 907-08. Today, too, "we affirm the trial court's order [on count two], but remand the case for the court's determination of whether Appellant is entitled to further amend [its] complaint." Charity, 698 So.2d at 908. This determination will depend on whether the City can allege the existence of a written contract. While "it was not error to dismiss this count[, we] think that this count should not have been dismissed with prejudice ... at this stage of the pleadings, and that appellant should have the opportunity to further amend [its] complaint to allege proper ultimate facts if [it] can." Emig v. State, Dep't of Health and Rehabilitative Servs., 456 So.2d 1204, 1208 (Fla. 1st DCA 1984). See Brown v. State, Dep't of Corrections, 701 So.2d 1211, 1212-13 (Fla. 1st DCA 1997).
Affirmed in part, reversed in part, and remanded.
ALLEN and PADOVANO, JJ., concur.
NOTES
[1] Section 403.0893, Florida Statutes (2000), provides as follows:

In addition to any other funding mechanism legally available to local government to construct, operate, or maintain stormwater systems, a county or municipality may:
. . . .
(3) Create, alone or in cooperation with counties, municipalities, and special districts pursuant to the Interlocal Cooperation Act, s. 163.01, one or more stormwater management system benefit areas. All property owners within said area may be assessed a per acreage fee to fund the planning, construction, operation, maintenance, and administration of a public stormwater management system for the benefited area. Any benefit area containing different land uses which receive substantially different levels of stormwater benefits shall include stormwater management system benefit subareas which shall be assessed different per acreage fees from subarea to subarea based upon a reasonable relationship to benefits received. The fees shall be calculated to generate sufficient funds to plan, construct, operate, and maintain stormwater management systems called for in the local program required pursuant to s. 403.0891(3). For fees assessed pursuant to this section, counties or municipalities may use the non-ad valorem levy, collection, and enforcement method as provided for in chapter 197.
[2] But the amended complaint in the present case fairly alleges, in effect, that DOT can avoid the payment of all stormwater utility fees by retaining stormwater runoff on its property.
[3] DOT takes this position in responding to the brief filed by amicus curiae Florida Association of Stormwater Utilities. As a technical matter, we deem the argument waived on account of the position DOT took with respect to user fees in the trial court, originally in the memorandum in support of its motion to dismiss the original complaint. In another memorandum, filed in support of its motion to dismiss the amended complaint, DOT again wrote: "Local governments may impose user fees on state property." As to sovereign immunity as a bar to suit for money damages, see part VII.
[4] Our supreme court approved the Second District's decision. 332 So.2d at 612 ("Our review of the matter persuades us to adopt the position ... adopted by the district court"), including the following:

The rationale which runs through our cases and which we are convinced should furnish the true test of immunity in the first instance, albeit a somewhat nebulous one, is the legislative intent in this regard with respect to the particular agency or function involved. That intent, rarely specifically expressed, is to be divined from a consideration of many factors, with a value judgment reached on an overall evaluation. All possible factors cannot be abstractly catalogued. The most obvious and common ones include the nature and scope of the instrumentality seeking immunity, the kind of function or land use involved, the extent of the public interest to be served thereby, the effect local land use regulation would have upon the enterprise concerned and the impact upon legitimate local interests.
City of Temple Terrace, 322 So.2d at 574 (quoting Rutgers, State Univ. v. Piluso, 60 N.J. 142, 286 A.2d 697 (1972)). Similarly canvassing the competing interests at stake here leads to the conclusion that sovereign immunity does not insulate DOT from having to pay the City valid utility charges.
At issue here are the charges billed on account of a parcel of property DOT uses for as yet unspecified purposes. Nothing in the amended complaint suggests, however, that DOT requires free utility services in order to be able to accomplish its mission or to perform the functions, whatever they may be, that it performs on the property at 2006 N.E. Waldo Road. The local interest in managing stormwater runoff is like the local interest in collecting and recycling or otherwise disposing of solid waste. See United Sanitation Servs. v. City of Tampa, 302 So.2d 435, 436 (Fla. 2d DCA 1974) (describing garbage collection as "a useful, indeed an indispensable, part of urban society"). To the extent any landowner using either of these municipal services fails to pay what is billed, the burden falls on other utility users to make up the difference. See Clein v. Lee, 146 Fla. 306, 200 So. 693, 694 (1941) ("He who enjoys the benefit without participating in the burden does so at the expense of those who pay.").
[5] For purposes of paying its utility bills, DOT is a "person" within the meaning of section 180.13(2), Florida Statutes (2000), which provides:

The city council, or other legislative body of the municipality, by whatever name known, may establish just and equitable rates or charges to be paid to the municipality for the use of the utility by each person, firm or corporation whose premises are served thereby; and provided further, that if the charges so fixed are not paid when due, such sums may be recovered by the said municipality by suit in a court having jurisdiction of said cause or by discontinuance of service of such utility until delinquent charges for services thereof are paid,....
Any other construction of the statute would put municipalities at risk for having to furnish state and federal agencies not just stormwater utility services but all municipal utility services without payment.
This construction of the statute finds support in the opinion in South Fla. Water Management Dist. v. Layton, 402 So.2d 597, 598 (Fla. 2d DCA 1981), where the court said, in addressing a state agency's contention that it was not a "person" within the meaning of an applicable statute:
Appellant contends that section 704.01 does not apply to it because it is not a "person" within the intendment of the statute and sovereign immunity has consequently not been waived. Chapter 704 does not define the word "person." Consequently, appellant urges, chapter 1, which contains definitions for construction of all statutes where context permits, is therefore applicable. "Person" is defined in section 1.01(3) to include "individuals, children, firms, associations, joint adventures, partnerships, estates, trusts, business trusts, syndicates, fiduciaries, corporations, and all other groups or combinations." A separate definition exists for "public body," "body politic," or "political subdivision," which are defined as including: "counties, cities, towns, villages, special tax school districts, special roads and bridge districts, bridge districts and all other districts in this state." Thus, for purposes of chapter 704, appellant concludes, a special district is not a "person." We disagree. Under the express provisions of section 1.01, the definitions contained therein apply only where the context permits. Had section 704.01 made a distinction between "persons" and "public bodies," "bodies politic," or "political subdivisions," we would agree with appellant. However, section 704.01 makes no such distinction, and we see no basis for necessarily assuming the legislature intended one here. For the reasons set forth below, we conclude that the legislature intended to include the state and its agencies within the meaning of "persons" as used in section 704.01.
Here, too, context requires reading "person" to include state agencies. For the same reasons the balancing of interests test takes into account, section 180.13(2), Florida Statutes (2000), should not be construed to exempt state agencies from having to pay for municipal utility services.
[6] The court stated in City of Littleton v. State, 855 P.2d 448, 454-55 (Colo.1993) (footnotes omitted):

The statutory scheme upon which the City relies in this case authorizes municipalities to collect fees "from any consumer or any owner or occupant of any real property" receiving services "furnished by, or the direct or indirect connection with, or the use of ... water facilities or sewerage facilities or both ...." § 31-35-402(1)(f), 12B C.R.S. (1986). The statute defines a "consumer" as "any public or private user of water facilities or sewerage facilities or both." § 31-35-401(1), 12B C.R.S. (1986). The inclusion of "public" as well as "private" users in the statutory definition of "consumer" expressly evidences a legislative intent to subject state institutions such as the State Community Colleges Board to the provisions of the statute. This specific language, coupled with the broad purposes of the statute to encourage the development of adequate municipal water and drainage systems, brings this case within the rationale of our decision in Colorado Civil Rights Commission [v. Regents of the University of Colorado, 759 P.2d 726 (Colo.1988)]. The absence of a specific reference to the State Community Colleges Board is immaterial in light of the clear and all-encompassing definition of those "consumers" subject to provisions of the statute. The purpose of the statute as well as the express language of section 31-35-401(1) would be rendered meaningless by a construction that exempted state institutions from its coverage. In our view, the General Assembly has by the adoption of sections 31-35-401(1) and 402(1)(f) clearly expressed its intent to subject the State Community Colleges Board to the fees charged by the City.
[7] Sovereign immunity can also be raised as an affirmative defense. See Pan-Am Tobacco Corp., 471 So.2d at 5 (noting that "Department of Corrections counter-moved for summary judgment asserting sovereign immunity as an affirmative defense"); Klonis v. State, Dep't of Revenue, 766 So.2d 1186, 1189 (Fla. 1st DCA 2000) ("[T]he trial court had jurisdiction to determine whether the defense of sovereign immunity applies to Appellant's claims. See [Department of Education v. Roe, 679 So.2d 756, 758 (Fla.1996)]; Michigan Millers Mutual Ins. Co. v. Bourke, 607 So.2d 418 (Fla.1992); State Dep't of Transportation v. Caffiero, 522 So.2d 57, 58 (Fla. 2d DCA 1988) (characterizing sovereign immunity as an affirmative defense)"); Theodore ex rel. Theodore v. Graham, 733 So.2d 538, 538 (Fla. 4th DCA 1999) (holding defendant was not "entitled to summary judgment based on her affirmative defense of sovereign immunity"); Mancher v. Seminole Tribe, 708 So.2d 327, 329 (Fla. 4th DCA 1998) ("The issue of whether sovereign immunity bars a complaint should likewise be addressed `by answer and affirmative defenses.' Lewis v. Edwards, 661 So.2d 1237, 1237 (Fla. 4th DCA 1995).").