# Third District Court of Appeal

**State of Florida**

Opinion filed January 26, 2017.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D13-57
Lower Tribunal No. 09-822-K
_____

**City of Key West,**
Appellant/Cross-Appellee,

vs.

**Key West Golf Club Homeowners' Association, Inc., et al.,**
Appellees/Cross-Appellants.

An Appeal from the Circuit Court for Monroe County, David J. Audlin, Jr., Judge.

Johnson, Anselmo, Murdoch, Burke, Piper & Hochman, P.A., and Michael T. Burke and Hudson C. Gill (Fort Lauderdale), for appellant/cross-appellee.

Smith Oropeza Hawks, P.L., and Barton W. Smith and Patrick M. Flanigan, for appellees/cross-appellants.

Before LAGOA and LOGUE, JJ., and SHEPHERD, Senior Judge.

LAGOA, J.

Appellant, the City of Key West (the "City") appeals from the trial court's entry of final judgment in favor of the Appellees, Key West Golf Club Homeowners' Association, Inc., Key West Golf Club, LLC, and Key West HMA, LLC, (hereinafter collectively the "landholders").

The landholders brought this action challenging the legality of the City's stormwater utility fees and seeking a refund for fees paid. After a bench trial, the court below entered final judgment in favor of the landholders, finding that the utility fee was arbitrary and discriminatory as applied because the landholders were non-users or minimal users of the City's stormwater services. The City appealed and the landholders cross-appealed the trial court's determination that the pre-litigation payments were voluntary and therefore not refundable.

Because competent, substantial evidence supports the trial court's conclusion that the City's stormwater utility fees were not reasonably based on the landholders' contribution to the City's stormwater system, we affirm. On the issue of voluntariness, we reverse as we find that the stormwater ordinance's onerous penalties for nonpayment were sufficient to make payment involuntary.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  College Road and the Stormwater Infrastructure

The landholders—a homeowners' association, a golf course, and a hospital—own or lease properties on North Stock Island, which is the portion of Stock Island that is north of US 1 and part of the incorporated City of Key West. On the island of Key West itself, the City's stormwater system is comprised of extensive infrastructure designed for both quantity (flooding) and quality (pollution) control, and it is much more developed in comparison with the minimal stormwater infrastructure on North Stock Island. No stormwater from North Stock Island flows into the island of Key West's stormwater collection and treatment facilities.

As can be seen from the attached map[1] of North Stock Island, the landholders' properties are enclosed within an irregular horseshoe-shaped loop created by College Road. Both ends of the horseshoe intersect with US 1. To the east of College Road is a waterway that is part of the Gulf of Mexico (the "Gulf"). In the late 1960s, the Florida Department of Transportation ("FDOT") constructed College Road. FDOT's general contractor, Charlie Toppino & Sons ("Toppino"), built the road at a higher elevation than the surrounding land and designed it to slope toward the Gulf so that stormwater runoff from the road would flow to the

---

[1] This map is in the record as part of the City of Key West's 2012 Stormwater Master Plan.

outer lane into several inlets (storm drains) and discharge through outfalls[2] (pipes) into the Gulf. There is no record evidence that the City contributed in any way to the construction of College Road, the inlets, or the outfalls.

When it was built, College Road landlocked a salt marsh, which is located adjacent to the properties involved in this appeal. In the 1980s, FDOT contracted with Toppino to construct seven culverts[3] beneath College Road to allow water to flow freely between the salt marsh and the Gulf and thereby to re-establish the tidal flow between the salt marsh and the Gulf. There is no record evidence that the City contributed in any way to the construction of the culverts.

College Road continues to be owned by FDOT; however, in 1971, the State entered into a written agreement with Monroe County requiring the County to maintain the road. Although no written agreement between the County and City exists, the City states that it orally agreed to maintain the already existing stormwater infrastructure on College Road after 1995 in exchange for a share of the State gas tax. By the City's own admission, the College Road infrastructure is therefore funded by its own separate revenue stream.

---

[2] The outfalls are numbered 56-63 on the included map. Outfalls 60-63 discharge directly into the Gulf.

[3] The culverts are not numbered on the map, but they are represented by seven lines intersecting College Road (between outfalls 62 and 63). The salt marsh is west of College Road and the Gulf is to the east. At trial, Toppino's president testified that either the Florida Department of Environmental Protection or the United States Environmental Protection Agency requested that the culverts be installed to reestablish the tidal flow to the salt marsh.

The trial court found that the maintenance of the stormwater infrastructure on College Road has been "sporadic, at best." Indeed, the record shows that very little, if any, maintenance was done until the landholders brought this action in 2009. In August 2010, a CH2M HILL engineer and an OMI representative[4] conducted a field review of the College Road infrastructure. During their inspection, they found that outfalls 60 and 61 (see map) were both blocked by extensive mangrove growth on both ends. According to their report, "[m]ost of the remaining outfalls were not found as their ends were deep within the mangroves growing in the swales and along the coastline." Only the seven culverts, which are large 36-inch by 48-inch elliptical corrugated pipes and naturally scoured by tidal currents, were observed to be flowing freely during the field review.

Apart from the stormwater infrastructure on College Road, it is undisputed that the landholders maintain their own private stormwater management systems—comprised of ponds, pumps, swales, and other infrastructure—that eventually discharge into the adjacent salt marsh where water flows freely between the marsh and the Gulf via the seven culverts discussed above. In order to operate a private stormwater system and discharge stormwater, the landholders are required to have certain permits, which are issued under the authority of the Florida Department of Environmental Protection. The landholders also have permits that allow them to

---

[4] CH2M HILL is the City's stormwater consultant. OMI (Operations Management International, Inc.) is the contracted operator of the City's stormwater systems.

5

trim and remove mangroves in order to maintain their private systems free from blockage.[5]

## B. The City's Stormwater Utility

Chapter 403, Florida Statutes, is titled the "Florida Air and Water Pollution Control Act." Section 403.0891 requires local governments to develop stormwater management programs. To fund their stormwater systems, municipalities are authorized to create stormwater utilities. § 403.0893, Fla. Stat. (2001). A "'[s]tormwater utility' means the funding of a stormwater management program by assessing the cost of the program to the beneficiaries based on their relative contribution to its need." § 403.031(17), Fla. Stat. (2001).

In 2001, the City established a stormwater utility. Key West, Fla., Code of Ordinances § 74-363. Due to the difficulty of measuring the precise contribution of every property to the City's stormwater system, the City calculates its stormwater fee based on a property's impervious surface area—i.e. artificial surfaces, such as pavements, that prevent or slow water from percolating into the ground.[6] Id. at §

---

[5] According to the City's 2011 North Stock Island Drainage Assessment, "[m]angroves themselves are not currently considered an endangered species but they are known to provide habitat to many threatened and endangered species in Florida, so they are afforded special regulatory protection." Unlike the landholders, the City did not have the required permits to maintain its stormwater system on North Stock Island free from mangrove blockage until several years after the landholders brought this action.

[6] For residential properties, the fee imposed is not based on the property's actual impervious area but instead on the average impervious area of residentially developed property per dwelling unit located within the City. Key West, Fla.,

74-365. This method is based on the assumption that the greater a property's impervious surface area, the more stormwater runoff that property will contribute to the City's system. Although this approach is not perfect, it is a legally permissible and widely used method for calculating stormwater utility fees. See City of Gainesville v. State, 863 So. 2d 138, 147 (Fla. 2003).

Since this method is based on statistical estimates, there may be situations in which the fee is not reasonably related to the amount of stormwater that makes its way into the City's system, as required by Chapter 403. Recognizing this, the City's Ordinance carves out an exemption for undisturbed property (property with no actual impervious surface area) and any property that retains "100 percent of the total volume of runoff within the property (measured on the basis of a 72-hour, 100 year storm event)."[7] Key West, Fla., Code of Ordinances § 74-361 (2001).[8] The Ordinance also establishes standards for reducing the stormwater utility fee:

---

Code of Ordinances § 74-365.

[7] A 100 year, 72-hour storm is one of several "design storms" and is equivalent to 17 inches of rainfall. Other design storms include a 2 year, 24-hour storm (5 inches); 5 year, 24-hour storm (6 inches); 10 year, 24-hour storm (7 inches); and 25 year, 72-hour storm (12 inches). The 100 year, 72-hour retention standard is an onerous one. After the landholders brought this action, the City commissioned a study to determine whether the standard could be met. According to the study, "[r]etaining a runoff volume of 15.5 in., or more, is challenging and expensive, but not impossible." At trial, the City's stormwater consultant testified that neither he nor anyone at CH2M HILL has ever recommended the 100 year, 72-hour, 100 percent retention standard and that the standard most commonly used by the South Florida Water Management District is a 25 year, 72-hour detention standard.

[8] The current version of the Ordinance also exempts "any property which does not contribute any storm water runoff to the city's stormwater management systems[,]"

a. Where stormwater management facilities are constructed and maintained, which collect and retain 100 percent of runoff on the property (measured on the basis of a 72-hour, 25-year storm event), the property owner shall receive a reduction of the user fee by 15 percent.

b. Where stormwater management facilities are constructed and maintained, which collect and retain 100 percent of runoff on the property (measured on the basis of a 72-hour, 50-year storm event), the property owner shall receive a reduction of the user fee by 25 percent.

Id. at § 74-365(f)(1). All agree that the landholders did not qualify for any exemptions or reductions.

In 1994, as required by the City's Comprehensive Plan, Kisinger, Campos and Associates performed a stormwater study that identified and mapped flood problems on the island of Key West. In 2001, the City created a Long Range Stormwater Utility Plan that identified flood zones and capital stormwater projects on the island of Key West. Although this 2001 plan was used to determine the City's stormwater utility fee, neither it nor the 1994 study identified flood zones or capital projects on North Stock Island. Despite North Stock Island's complete absence from these stormwater planning documents, the City, in 2003, began charging North Stock Island property owners a monthly stormwater utility fee under the identical fee structure charged to property owners on the island of Key

but this exemption was not in the Ordinance when the landholders brought their action. See Key West, Fla., Code of Ordinances § 74-361 (2016).

8

West. In 2006, Perez Engineering & Development, Inc. prepared a Draft Design Memorandum that updated the mapping and computer simulation model of the City's drainage system. As with the City's prior studies and plans, the 2006 report omitted any discussion of North Stock Island.

Only after the landholders brought this action did the City evaluate the stormwater runoff on North Stock Island in its 2011 North Stock Island Stormwater Drainage Assessment. At trial, the City's witness, a CH2M HILL representative, testified that the North Stock Island stormwater study was commissioned in preparation for this litigation. The City subsequently included the 2011 study in the City's 2012 Stormwater Master Plan. According to the 2011 assessment:

> The City has conducted stormwater planning for the main island of Key West, but has not conducted a study for NSI [North Stock Island] previously. NSI was annexed to the City in the mid-1990s and there are no known serious flooding problems located here.

The assessment identified two stormwater improvements that could be made to North Stock Island's existing stormwater infrastructure: (1) install new headwalls and aprons at the outfalls to prevent mangrove growth and allow for easier maintenance in the future and (2) retrofit the College Road inlets with water quality inserts to reduce the discharge of pollutants.

9

The trial court found that since 2003, the hospital had paid approximately $150,000; the golf course, approximately $109,200; and the homeowners' association, approximately $109,200 in stormwater utility fees. Following a three-day bench trial, the trial court found that the stormwater utility fee was arbitrary and discriminatory as applied to the landholders because the landholders were non-users or minimal users of the City's stormwater services. The trial court further awarded the landholders a refund only of fees paid after the suit was filed because it found that pre-suit payments were made voluntarily. The City appeals the trial court's determination that its stormwater utility fee is arbitrary and discriminatory, and the landholders cross-appeal the trial court's determination that pre-litigation payments were voluntary and not refundable.

II.   ANALYSIS

A. **Reasonableness of the City's Stormwater Utility Fee and Standard of Review**

Although municipalities enjoy broad discretion in setting utility rates, a city may not charge a rate that is "arbitrary, unreasonable, or discriminatory." City of Gainesville, 863 So. 2d at 147; see also Mohme v. City of Cocoa, 328 So. 2d 422, 424–25 (Fla. 1976) ("Our courts will intervene to strike down unreasonable or discriminatory public utility service rates prescribed by the Legislature, a municipality, or municipal commission; however, courts will not themselves fix

10

prospective rates.").[9] This principle is reflected in the requirement that a stormwater utility be assessed based on the beneficiaries' "relative contribution" to the need for a stormwater management system. See City of Gainesville, 863 So. 2d at 147; § 403.031(17), Fla. Stat. (2001).

Consequently, the central issue before us is whether the City's stormwater utility fee is reasonably based on the landholders' relative contribution to the City's stormwater management system.[10] Following a bench trial, the trial court

[9] The dissent claims that our review of the City's stormwater utility as applied to these landholders "usurps the legislature's discretion to set utility rates." While we recognize that municipalities enjoy broad discretion in setting utility rates, this discretion is not absolute and cannot be exercised in a manner that is arbitrary, unreasonable, or discriminatory. See City of Gainesville and City of Cocoa supra.

[10] The dissent accuses the majority of departing from "well-established law" because our interpretation of the relative contribution requirement is "improperly narrow." However, we read the statute to mean exactly what it says, which is that the cost of a stormwater management program must be assessed "to the beneficiaries **based on their relative contribution to its need**." § 403.031(17), Fla. Stat. (2001) (emphasis added). The dissent, which repeatedly charges the majority with improperly assuming a legislative function, ignores this straightforward language in favor of its own "version" of the statute that adds language not included by the Legislature in the actual statutory text: e.g., "the statute at issue authorizes stormwater utility fees to be paid **based upon a ratepayer's contribution to the need for, and benefit from, the stormwater utility**." Dissent at 30-31 (emphasis added). This rewriting of the statute allows the dissent to disregard the statutory relative contribution requirement and focus on the general benefits the landholders receive from a citywide stormwater program— benefits that even the currently exempted property owners who retain all stormwater runoff or whose properties are undeveloped also enjoy. Indeed, the dissent suggests that the purported general benefits are sufficient for the imposition of a stormwater fee regardless of the landholders' contribution to need: "under the black letter law governing statutorily authorized utility fees, ratepayers contribute to the need for, and benefit from, a utility **when they benefit from the existence of the utility whether or not they want it or 'use' it.**" Dissent at 31 (emphasis

11

determined it was not, and in doing so made specific factual findings that were the foundation for the trial court's legal conclusion.

"In reviewing a judgment rendered after a bench trial, 'the trial court's findings of fact come to the appellate court with a presumption of correctness and will not be disturbed unless they are clearly erroneous.' Thus, they are reviewed for competent, substantial evidence." Underwater Eng'g Servs., Inc. v. Util. Bd. of the City of Key West, 194 So. 3d 437, 444 (Fla. 3d DCA 2016) (citation omitted). "[A]n appellate court is not free to substitute its judgment for the trier of fact, or to weigh evidence and reach a different conclusion from that reached at trial." Crain

---

added). But cf. City of Gainesville, 863 So. 2d at 145 ("'User fees' are those which are charged only to the person actually using the service, and the amount of the charge generally is related to the actual goods or services . . . ." (quoting 70C Am.Jur.2d, Special or Local Assessments § 2, at 631-32 (2000))). The dissent's rewriting of the statutory language and its blurring of the meaning of a user fee is not surprising as the dissent does not attempt to articulate how the utility fee in this case is reasonably based on the landholders' relative contribution to need. To support its departure from the plain language of the statute, the dissent cites a line of cases upholding other types of fees, such as sewer availability and garbage collection fees, when a ratepayer does not use those systems; however, none of those cases interprets or mentions a statutory "relative contribution" provision analogous to the one before us here. Moreover, those cases dealt with users who were connected to the relevant utility or whose property would likely use the utility service in the future. In contrast, competent and substantial evidence established below that: the landholders' stormwater discharge was not part of the City's MS4 system; the culverts connecting the marsh to the Gulf had not been built by the City and had never been maintained by the City; the natural tidal scouring of the culverts meant that the City would likely never need to provide maintenance; the City did not include the culverts in any of its future plans on North Stock Island; and the City already was receiving a part of the County's share of the State's gas tax revenue to maintain North Stock Island infrastructures.

12

& Crouse, Inc., v. Palm Bay Towers Corp., 326 So. 2d 182, 182 (Fla. 1976). Indeed, even if the evidence is conflicting, because a trial court's factual findings are clothed with a presumption of correctness, "[a]s long as there is competent, substantial evidence to buttress this finding, an appeals court should not substitute its judgment for that of the trier of fact." Markam v. E.C. Fogg, III, 458 So. 2d 1122, 1126 (Fla. 1984) (finding that although evidence was conflicting, competent, substantial evidence was adduced at trial to support trial court's findings and district court erred in reversing trial court on this point).

### B. **Stormwater Management System: Pollution Control and Flood Control**

Although the primary purpose of Chapter 403 is pollution control, see section 403.021, Florida Statutes (2001), "stormwater management system" is also defined to include an additional component that is relevant here: flood control. Specifically, Section 403.031(16), Florida Statutes (2001), defines "[s]tormwater management system" as "a system which is designed and constructed or implemented to control discharges which are necessitated by rainfall events, incorporating methods to collect, convey, store, absorb, inhibit, treat, use, or reuse water **to prevent or reduce flooding**, overdrainage, environmental degradation and water pollution or otherwise affect **the quantity** and quality of discharges from the system." (emphasis added)). The parties' arguments relate to both the pollution control and flood control components. We therefore evaluate the

13

landholders' contribution to the City's stormwater management pollution control and flood control systems in turn.

## 1. Pollution Control

The City's stormwater pollution control system is known as a municipal separate storm sewer system ("MS4"), and it is regulated by the National Pollutant Discharge Elimination System ("NPDES") permit program. The Clean Water Act created the NPDES program to regulate point sources[11] discharging into the waters of the United States. 40 C.F.R. § 122.1. Because the City's stormwater system discharges into waters of the United States, i.e., the Gulf, it is required to have an MS4 permit. Components of an MS4 include "a conveyance or system of conveyances (including roads with drainage systems, municipal streets, catch basins, curbs, gutters, ditches, man-made channels, or storm drains)" owned or operated by the City and designed for collecting or conveying stormwater. 40 C.F.R. § 122.26(b)(8). However, the components of an MS4 do not include conveyances that connect waters of the United States. See 40 C.F.R. § 122.26(b)(9); see also id. § 230.3(o) (defining the term "waters of the United States" as "including all waters subject to the ebb and flow of the tide"). Here, the

_____

[11] A point source is "any discernible, confined, and discrete conveyance," such as a pipe, "from which pollutants are or may be discharged." 40 C.F.R. § 122.2. This is in contrast to a non-point source, which comes from a diffuse source.

salt marsh bounded by College Road constitutes "waters of the United States" as it is subject to the tidal flow of the Gulf.

Since the landholders' private stormwater system discharges into the salt marsh, which for permitting purposes is considered the same receiving body as the Gulf, the landholders are also required to have certain permits. Because the landholders do not operate an MS4, their permits are not issued pursuant to the NPDES program; instead, the South Florida Water Management District, under the authority of the Florida Department of Environmental Protection, issues their permits. This type of permit is known as an Environmental Resource Permit or "ERP".

A cursory understanding of this framework is necessary to evaluate the landholders' principal argument. They argue that because their stormwater is collected, treated, and conveyed by means of a private stormwater system that discharges directly into the salt marsh, it never enters the City's stormwater management system. With respect to the City's pollution control system—the MS4—the landholders are correct. At no point do the landholders contribute stormwater to the City's MS4 because once they discharge their water into the salt marsh, in compliance with their ERP permits, it is no longer considered stormwater, because it has merged into waters of the United States. Moreover, the culverts between the salt marsh and the Gulf are not a component of the City's

MS4 because the culverts are merely conveyances connecting waters of the United States. Simply put, the salt water marsh and the culverts are not part of the City's pollution control system.

On appeal, the City retreats from its arguments below that the landholders contribute to the City's MS4 pollution control system. In its reply brief, the City concedes that "the issue is not whether the stormwater leaving the Appellees' properties qualified as a pollutant or entered part of the City's MS4-permitted treatment system." The City, however, continues to maintain that the landholders benefit from the City's pollution control system because the various stormwater inlets along College Road are fitted with trash guards. Further, one of the two recommended improvements in the 2011 North Stock Island Drainage Assessment deals with pollution control:

> [U]nder the auspices of their National Pollutant Discharge Elimination System (NPDES) permit requirements, the City plans to retrofit the street inlets (City-operated) along College Road with water quality inserts that will help reduce and prevent the discharge of pollutants that may be entering the outfalls <u>from the street</u>.

(emphasis added).

This would be a more compelling argument were it not for the fact that the landholders' stormwater does not pass through the inlets along College Road and, consequently, does not contribute to the need for that infrastructure. Rather, their

16

stormwater is either retained on their properties or discharged into the salt marsh. Indeed, the City acknowledges this in its initial brief: "the evidence at trial established that the Appellees' stormwater all drained into the Salt Marsh[.]" Consequently, even if the landholders receive some general benefit from the trash guards that is shared by other residents of the City in the form of improved water quality in and around the City, this is insufficient to justify imposition of the City's stormwater utility fee because the landholders do not specifically contribute to the need for any of the planned or existing pollution control devices installed in the College Road inlets that address stormwater runoff from the street (as opposed to runoff from the landholders' properties), as required by section 403.031(17), Florida Statutes (2001).

The focus on general benefits the landholders might enjoy as a result of the minimal stormwater infrastructure along College Road, such as improved water quality in and around the City, overlooks an important distinction between a utility fee and a tax.[12] As the Supreme Court explained in State v. City of Port Orange, 650 So. 2d 1, 3 (Fla. 1994):

> User fees are charges based upon the proprietary right of the governing body permitting the use of the instrumentality involved. Such fees share common traits

---

[12] See City of Gainesville, 863 So. 2d at 143 n.3 ("If the stormwater fees were a tax, they would be illegal because the Florida Constitution authorizes municipalities to impose only ad valorem taxation 'except as provided by general law,' see art. VII, § 1(a), Fla. Const., and no law has authorized such a tax.").

17

that distinguish them from taxes: **they are charged in exchange for a particular governmental service which benefits the party paying the fee in a manner not shared by other members of society**, National Cable Television Assn. v. United States, 415 U.S. 336, 341, 94 S.Ct. 1146, 1149, 39 L.Ed.2d 370 (1974); and they are paid by choice, in that the party paying the fee has the option of not utilizing the governmental service and thereby avoiding the charge. Emerson College v. City of Boston, 391 Mass. 415, 462 N.E.2d 1098, 1105 (1984) (citing City of Vanceburg v. Federal Energy Regulatory Comm'n, 571 F.2d 630, 644 n. 48 (D.C.Cir.1977), cert. denied, 439 U.S. 818, 99 S.Ct. 79, 58 L.Ed.2d 108 (1978)).

(emphasis added). In other words, a utility fee is not the appropriate funding mechanism for general benefits that are shared by other members of society. If these benefits were sufficient for the imposition of a stormwater utility, even the owners of undeveloped properties with no impervious surface area and properties that retain 100% of their stormwater runoff could be charged because they too benefit from improved water quality in and around the City.

If pollution control were the sole component of the City's stormwater management system, the landholders clearly would be correct that they do not contribute to the City's system because at no point does their stormwater enter the City's MS4.[13] Further, the general benefits the landholders may receive as a result

---

[13] The dissent admits that the landholders' runoff is not treated by the City, but nevertheless concludes that they "clearly contribute to the need for the stormwater anti-pollution services by discharging runoff into the City's salt marsh, which then flows into the Gulf." Dissent at 39. The dissent never explains how discharged water that is treated by the landholders but that is never treated by the City and

of planned or existing pollution control devices installed along College Road which neither collect nor treat the landholders' stormwater are not sufficient to support imposition of the utility fee on the landholders. But as has already been mentioned, the City's stormwater management system encompasses more than its MS4; it also includes a flood control component.

## 2. Flood Control

Here again we are confronted with arguments that rely on general benefits enjoyed by the landholders while ignoring the necessary inquiry into the

expressly not part of the City's MS4 system "clearly" contributes to the need for the City's pollution control system. Contribution aside, the dissent also makes an argument never raised by the City, that "[t]he City's program also allows the landholders to avoid more onerous and expensive treatment for their runoff under applicable state and local laws." Id. Indeed, the dissent repeatedly raises and relies on a number of arguments not raised below before the trial court or to this Court on appeal. The law is well-established, however, that "[f]or an issue to be preserved for appeal, . . . it 'must be presented to the lower court and the specific legal argument or ground to be argued on appeal must be part of that presentation if it is to be considered preserved.'" See Roth v. Cohen, 941 So. 2d 496, 500 (Fla. 3d DCA 2006) (quoting Archer v. State, 613 So. 2d 446, 448 (Fla. 1993)).

This particular argument of the dissent seems to be premised on the notion that if the City did not treat its stormwater, the water bodies into which the City discharges could become "impaired," which would require more stringent limitations on the discharge of pollutants (known as the Total Maximum Daily Load or "TMDL"). See 33 U.S.C. § 1313(d). Presumably, the City did not raise this argument because the coastal waters around the City of Key West and North Stock Island have already been determined to be impaired. Eric Livingston, who was the bureau chief over the TMDL program from 1999 to 2010, acknowledged that fact at trial. Moreover, Mr. Livingston explained that properties with a stormwater treatment system under an ERP, such as the properties in this case, "do not have to do any additional treatment until all properties that have no treatment come up to the same level of treatment as provided by the [properties within the ERP]."

19

landholders' contribution, or lack thereof, to the need for the City's flood control systems. Both the City and the dissent contend that the landholders benefit from the inlets, catch basins, and outfalls along College Road because were it not for these structures, College Road would flood.[14] This overlooks the record evidence that the landholders do not specifically contribute to the need for these structures because their stormwater never enters the inlets, catch basins, and outfalls along the road. In other words, the stormwater discharge from College Road—a publicly maintained road used by the general public including the landholders—cannot be imputed to the landholders or their properties.

Since the landholders' stormwater is either detained or discharged into the salt marsh after passing through a private stormwater system, the culverts under College Road are the only public infrastructure serving the landholders' stormwater for both pollution and flood control purposes. The City and dissent both argue that the landholders benefit from this infrastructure because if the culverts were to be blocked, their properties would flood. Assuming the salt marsh

---

[14] The 2011 North Stock Island Stormwater Drainage Assessment modeled drainage under two different conditions: (1) assuming fully functional outfalls and (2) assuming outfalls that are blocked at 80 percent. With the assumed blockage, the model showed that the southwestern corner of College Road could indeed flood. According to the assessment, "[t]his overflow could be problematic for the larger 100-year storm; however, eastern College Road remains un-flooded so access to the hospital and community college would be maintained through the eastern side of the loop road." In other words, the side of College Road where the properties in this appeal actually are located would not flood during a 100-year storm even if the City's outfalls were mostly blocked.

20

and culverts are components of the City's flood control system, this appears to be the only argument that properly takes into account the contribution requirement for a stormwater utility fee.

In response, the landholders point to the considerable record evidence that the culverts, which were installed by FDOT decades ago, require little to no maintenance because they are naturally scoured from tidal action and have remained clear even as the neglected inlets, catch basins, and outfalls serving College Road became blocked with mangrove growth and silt buildup. The landholders also argue that because the City orally agreed to maintain the College Road infrastructure in exchange for a share of the State gas tax, the City is, in effect, charging for a service that already has a source of funding.

Finally, the landholders contend that nothing in the record supports charging them such large sums of money for the negligible maintenance of the minimal stormwater infrastructure or for any anticipated future stormwater expenditures on North Stock Island to address discharge not specific to the landholders' properties.
.

Based on the record evidence presented below, competent, substantial evidence exists to support the trial court's findings of facts. We therefore cannot say that the trial court's conclusions of law were clearly erroneous and therefore we affirm the trial court's final judgment in favor of the landholders. While it is

21

true that stormwater rates need not precisely correlate with actual use, <u>City of Gainesville</u>, 863 So. 2d at 148, the disparity here is unreasonable.

The record shows that from the inception of the stormwater utility in 2001 until after the commencement of this action, the City collected over $250,000 in fees from the landholders but neglected to perform <u>any</u> stormwater planning for or maintenance on North Stock Island. The City's stormwater planning documents did not even include North Stock Island until 2011. Inspections of the stormwater infrastructure along College Road in 2010 revealed outfalls clogged with silt and blocked by mangrove growth, and many of the outfalls could not be located because they were covered by overgrowth. Moreover, the City did not even have the permits necessary to maintain the College Road infrastructure until after the release of the 2011 Drainage Assessment, which makes the following recommendation: "the results of this evaluation validates [sic] that the City should pursue the proper permits to clear mangroves from the exit of the pipes to keep the flow pathways clear to open water." Despite its undisputed disregard for North Stock Island, the City charged the landholders a stormwater utility fee based on the same rate as property owners on the island of Key West.

Throughout this period of neglect, the seven culverts under College Road that connect the salt marsh to the Gulf remained clear. All parties agree that the culverts are naturally scoured by the tide and therefore require little to no

maintenance. In fact, in its initial brief, the City outlines its maintenance thus far of the College Road infrastructure (all of which has taken place after the commencement of this action):

> The City's maintenance efforts of the stormwater facilities along College Road has [sic] included clearing the mangrove growth from the *outfalls and inlets* . . . .
>
> The City has also contracted with engineers to develop and design systems that would prevent the growth of mangroves in the *inlets* of the City's stormwater system . . . .
>
> The City is also in the process of purchasing and installing water quality inserts for the *inlets* along the City right-of-way on College Road.

(Emphasis added). Notably, absent is any mention of the only stormwater infrastructure used by the landholders: the culverts. In other words, although the City has charged the landholders hundreds of thousands of dollars in fees, it is unable to identify any maintenance or future improvements associated with the one component of its flood control system to which the landholders arguably contribute. Although the City contends that it should not be "penalized because one portion of its stormwater management system is self-cleaning," it is not the City that is being penalized.[15]

---

[15] Moreover, to the extent that flood control measures are needed on College Road that are unrelated to the landholders' stormwater, nothing in the record prohibits the City from using its tax revenues to maintain structures that benefit the general public but which do not deal with stormwater contributed by the landholders.

## C. **Voluntariness of Fees Paid**

Finally, we address the landholders' issue on appeal: whether pre-litigation fees were voluntary and therefore nonrefundable. All agree that fees paid pursuant to an unlawful assessment are generally refundable, provided they were not paid voluntarily. See Coe v. Broward Cty., 358 So. 2d 214, 216 (Fla. 4th DCA 1978) ("[A] taxpayer is normally entitled to a refund of taxes paid pursuant to an unlawful assessment."); see also Bill Stroop Roofing, Inc. v. Metro. Dade Cty., 788 So. 2d 365, 367 (Fla. 3d DCA 2001) (agreeing "with the Fourth District Court that once the illegality of either [a tax or a fee] is established, the prerequisites for recovery are the same" (citing Ves Carpenter Contractors, Inc. v. City of Dania, 422 So. 2d 342, 344 (Fla. 4th DCA 1982))); City of Miami v. Florida Retail Fed'n, Inc., 423 So. 2d 991, 993 (Fla. 3d DCA 1982) ("[W]hether taxpayers who failed to protest may obtain a refund depends on whether the excessive tax was paid voluntarily or involuntarily."). The disagreement before us concerns what constitutes a voluntary or involuntary payment, and, more specifically, whether an overt threat is required to establish an involuntary payment.

The landholders argue that payment of the utility fees was involuntary and compulsory because failure to pay would result in stiff penalties. For example, nonpayment would result in the automatic imposition of late fees and liens; the risk of a collection action (including potential attorney's fees and costs); the loss of

utility services and denial of building permits; and, with respect to the Golf Course, the risk of jeopardizing its lease with the City. The landholders' position is firmly supported by case law from around the state. See, e.g., North Miami v. Seaway Corp., 9 So. 2d 705, 707 (Fla. 1942) ("Payment to avoid onerous penalties is generally considered as involuntary and compulsory."); Ves Carpenter, 422 So. 2d at 345; Florida Retail Fed'n, Inc., 423 So. 2d at 993.

The City does not dispute that its stormwater ordinance imposes severe penalties for nonpayment; however, it relies on the trial court's understanding of the voluntary payment doctrine for the proposition that severe penalties listed in an ordinance are alone insufficient to establish an involuntary payment. The trial court determined, based on this Court's decision in City of Key West v. Florida Keys Community College, 81 So. 3d 494 (Fla. 3d DCA 2012), a case addressing the same stormwater utility fee before us here, that the meaning of involuntary has "metamorphosed" in this Court to include a requirement of an overt threat apart from the penalties in the City's ordinance. According to the trial court, "the mere *existence* of an ordinance with provisions for severe penalties for nonpayment of charges assessed is not an 'actual or threatened exercise of power.'"

In Florida Keys Community College, this Court stated, based on the particular facts in that case, that payment was involuntary because the City threatened to exercise enforcement measures against the College for nonpayment.

25

The trial court concluded that because we simply could have relied on the penalties in the City's ordinance to find the payment involuntary but instead we mentioned the City's threat, <u>Florida Keys</u> added a new requirement to the voluntary payment doctrine. This interpretation, however, reads too much into the recitation of the particular facts in that decision.

Florida law consistently provides that when an ordinance clearly imposes severe penalties for nonpayment, the voluntary payment doctrine does not require a payer to seek confirmation from a municipality that the ordinance means what it says. The ordinance itself is a threatened exercise of power and therefore compulsory. We have not departed from this general rule in <u>Florida Keys Community College</u>.

## III. CONCLUSION

Given the record evidence before us, we find that competent, substantial evidence exists to support the trial court's findings of facts and conclusions of law that the landholders were minimal users of the City's stormwater infrastructure. We therefore affirm the trial court's order finding the City's stormwater utility arbitrary and discriminatory as applied to the home owners' association, golf course, and hospital. As to the refund of fees paid, we reverse the trial court's

determination that the landholders' pre-litigation payments were voluntary, and we remand for further proceedings.

Affirmed in part; Reversed in part.

SHEPHERD, Senior Judge, concurs.

# MAP OF NORTH STOCK ISLAND



28

LOGUE, J. (Dissenting)

The majority opinion simply shifts the Hospital, Golf Course, and Association's share of the costs of the City's stormwater management program to the remaining ratepayers. It thereby creates a small, but across-the-board rate increase for all of the other ratepayers in Key West. This is the mirror image of the unfairness of which the Hospital, Golf Course, and Association originally complained. The Hospital, Golf Course, and Association should share the burden of these costs because they clearly contribute to the need for, and benefit from, the City's stormwater management program.

The Hospital, Golf Course, and Association contribute to the need for the stormwater management program because they discharge stormwater runoff into a salt marsh whose bottom land is owned by the City and for which the City provides the only stormwater services. They clearly benefit from the program because: (1) but for the City's infrastructure on North Stock Island, their properties and approach road would flood; and (2) but for the citywide stormwater anti-pollution services provided by the stormwater management program, their ability to discharge runoff would be curtailed by state and federal regulators. Contrary to the majority opinion, these are not benefits to the general public because the general public can avoid the road and the landholders' properties when flooded

while the landholders cannot, and because the general public does not discharge stormwater runoff while the landholders do.

I believe the only legitimate dispute here concerns the amount of the utility fees. No system for setting utility rates is perfect. But the method of calculating the fees used here by the City was authorized by the legislature and has already been upheld by the Florida Supreme Court in City of Gainesville v. State, 863 So. 2d 138, 145 (Fla. 2003). Under the existing black letter law in this area, the City can legally charge these landholders the stormwater utility fees.

ANALYSIS

I believe the majority opinion departs from the well-established law in this area because (1) it adopts an improperly narrow concept of how a ratepayer contributes to the need for, and benefits from, a stormwater management program; (2) it improperly indicates that citywide stormwater anti-pollution services are general benefits that should be paid by taxes when the legislature has authorized those services to be funded by utility fees from landowners who generate stormwater runoff; and (3) it usurps the legislature's discretion to set utility rates.

**1. The majority opinion adopts an improperly narrow concept of how a ratepayer contributes to the need for, and benefits from, a stormwater management program.**

Like similar statutes, the statute at issue authorizes stormwater utility fees to be paid based upon a ratepayer's contribution to the need for, and benefit from, the

30

stormwater utility. §403.031(17), Fla. Stat. (2001) (defining "stormwater utility" as "the funding of a stormwater management program by assessing the cost of the program to the <u>beneficiaries</u> based on their relative <u>contribution</u> to its <u>need</u>" (emphasis added)). In the majority opinion, however, this standard is somehow reduced to the concept that a ratepayer can be charged only if the ratepayer "uses" stormwater infrastructure. And the majority opinion limits the definition of "use" to mean "stormwater [ ] makes its way into the City's system." In diminishing the standard in this manner, the majority opinion misconstrues the law governing legislatively authorized utility fees.

Contrary to the majority opinion, under the black letter law governing statutorily authorized utility fees, ratepayers contribute to the need for, and benefit from, a utility when they benefit from the existence of the utility, despite whether they want it or "use" it. In such circumstances, the Florida Supreme Court has noted, "this Court has not hesitated to uphold local ordinances imposing mandatory fees, regardless of whether the individual customer actually uses or desires the service." <u>City of Gainesville</u>, 863 So. 2d at 145 (quoting <u>Pinellas Cty. v. State</u>, 776 So. 2d 262, 268 (Fla. 2001)) (upholding stormwater utility fees). The majority opinion simply ignores this holding of <u>City of Gainesville</u>.

In <u>City of Gainesville</u>, moreover, when upholding stormwater utility fees virtually identical to those at issue here, the Florida Supreme Court cited with

31

approval a long line of cases holding that a utility fee was legally imposed when a landowner benefited from the existence of the utility whether or not he actually "used" it.  Id. at 146 (citing State v. City of Miami Springs, 245 So. 2d 80 (Fla. 1971) (holding that a municipality may charge a mandatory fee for sewer service unrelated to actual use); Town of Redington Shores v. Redington Towers, Inc., 354 So. 2d 942 (Fla. 2d DCA 1978) (holding that the subject sewer fee applied to unoccupied condominiums without regard to actual use); Stone v. Town of Mexico Beach, 348 So. 2d 40 (Fla. 1st DCA 1977) (upholding a mandatory flat rate for garbage service, regardless of use); City of Riviera Beach v. Martinique 2 Owners Ass'n, 596 So. 2d 1164 (Fla. 4th DCA 1992) (holding that the subject solid waste removal ordinance applied to unoccupied condominiums without regard to actual use)). The majority opinion suggests these utility fee cases are not applicable to stormwater utility fees, but the Florida Supreme Court itself cited these cases in City of Gainesville to determine the legality of a stormwater utility fee.  These cases are more to the point than the general user fee cases relied upon by the majority opinion.

These cases provide significant guidance. Their holdings are irreconcilable with the crabbed view of "use" utilized by the majority opinion.  In fact, every single one of these cases would have been decided differently if the courts had adopted the artificially restricted view of "contribution to the need for, and benefit

32

from" the utility that the majority opinion employs here. For example, in <u>Miami Springs</u>, the ratepayer was subject to the utility fee even though his sewage did not "make[] its way into the City's system," as the majority opinion here requires. 245 So. 2d at 83. In <u>Redington Shores</u>, the ratepayer was subject to the utility fee even though his sewage did not make its way into the town's system, as the majority opinion here requires. 354 So. 2d at 942.

The majority opinion's misconception that stormwater must make its way into a pipe in order for a ratepayer to benefit from infrastructure simply does not reflect the "contribution to the need for, and benefit from" legal standard to be applied in analyzing utility rates. Indeed, if adopted as the law of Florida, the majority opinion's approach would allow a utility ratepayer to chop a utility into component parts and obtain a judicial rate reduction based only on the parts of the system it "used." So, for example, a sewer utility ratepayer located near a water treatment plant could contend it used only the pipes and pumping stations between its property and the plant because its sewage makes its way only into those pipes. It could object to paying rates to support pipes and infrastructure farther from the plant than its own property because its sewage does not make its way into those pipes. Properly understood, the argument of the Hospital, Golf Course, and Association in this case is no more than a variation on this theme.

33

Ad hoc judicial utility rate adjustments based on the balkanization of utility infrastructure like that conducted by the majority opinion here invites abuse. In the long run, judicial utility rate adjustments will generate more unfairness than the current legislative ratemaking process whose broad and realistic perspective allows consideration of the effect of a rate change on all ratepayers, not just the ratepayers who happen to be before the court.

For this reason, as the cases cited by the Florida Supreme Court in City of Gainesville indicate, the analysis of whether a ratepayer contributes to the need for, or benefits from, a utility service is pragmatic, flexible, and soundly rooted in the real world. Taking this approach, it is clear that the Hospital, Golf Course, and Association in the instant case did contribute to the need for, and did benefit from, the City's stormwater utility. This is true even if one concentrates only on the anti-flooding infrastructure and dismisses the anti-pollution services provided by the stormwater management program, as the majority opinion largely does, as discussed in the next section.

The City's anti-flooding stormwater infrastructure on North Stock Island, as the trial court expressly found, "consist[s] of catch basins, culverts, and pipes carrying water from the basins to the salt marsh and then to the Gulf of Mexico, or to the Gulf directly." Key West Golf Club Homeowners' Assoc. v. City of Key West, Order Declaring Section 74.365 Illegal, Case no. 2009-CA-822-K at 7 (Fla.

Cir. Ct. Nov. 9, 2012). The seven culverts allow the water in the salt marsh, including the stormwater runoff from the landholders' properties, to flow into the Gulf. The City has and continues to maintain this stormwater infrastructure. As expressly found by the trial court, "The City of Key West controls and maintains a stormwater system on North Stock Island." Id. at 20. The Hospital, Golf Course, and Association contribute to the need for this infrastructure because they discharge runoff into the salt marsh.

Do the Hospital, Golf Course, and Association benefit from this infrastructure? The undisputed testimony of numerous witnesses was that, without the City's stormwater management program (which the trial court found includes the culverts that allow the salt marsh to flow into the Gulf), the salt marsh would back up and the Hospital, Golf Course, and Association properties would flood. In addition, without the City's stormwater infrastructure, College Road, the road necessary to access the landholders' property, also would flood. This flood protection is provided by storm drains and outlets along College Road that divert stormwater coming onto the road into either the salt marsh or directly into the Gulf. The seven culverts are also components of this flood protection.

Thus, the Hospital, Golf Course, and Association benefit immensely as landholders from the stormwater management program: they gain access to and use of their land. This benefit is completely different from any ancillary benefit

35

provided to the general public which could avoid the flooded road and properties. The majority opinion's conclusion that the Hospital, Golf Course, and Association receive no benefit from the anti-flooding infrastructure is flatly contradicted by the record and rests on the majority opinion's inappropriately narrow concept of "use."

2. **The majority opinion improperly dismisses the legislature's determination that citywide stormwater anti-pollution services should be paid by utility fees from landowners who generate stormwater -- not by taxes on the general public.**

The most pernicious error in the majority opinion is its conclusion that the citywide stormwater anti-pollution services funded by the utility fees benefit only the general public, and therefore should be paid by taxes. Referring to these services, the majority writes, "a utility fee is not the appropriate funding mechanism for general benefits that are shared by other members of society." But these services provide landowners a specific and unique benefit directly related to the landowners' discharge of stormwater runoff. The majority opinion erroneously refuses to credit one of the greatest legislatively authorized benefits that the Hospital, Golf Course, and Association receive from their payment of the utility fees.

This error begins with the majority opinion's failure to recognize the legislature authorized the utility fee to fund, not just infrastructure, but the City's entire "stormwater management program." § 403.0891(3), Fla. Stat. See also § 403.031(17) (defining "stormwater utility" as "the funding of a stormwater

36

management program by assessing the cost of the program to the beneficiaries based on their relative contribution to its need" (emphasis added)).

The undisputed testimony indicated that the City's stormwater management system includes a host of citywide stormwater anti-pollution services. These citywide services include flood and pollution control education, storm drain stenciling, a stormwater hotline (to report polluters using storm drains), testing for illicit discharges into the storm drains, mandatory intergovernmental coordination regarding water quality at the watershed or basin in which the City is located, water monitoring, and enacting and enforcing an ordinance requiring compliance with Florida Department of Environmental Protection and South Florida Water Management District rules and regulations. Stormwater runoff necessitates these services. And most importantly, these services are legally authorized to be part of the stormwater management program funded by the utility fees: "Stormwater management programs shall use a combination of nonstructural and structural best management practices . . . ." Fla. Admin. Code R. 62-40.431(3) (emphasis added).

As the undisputed testimony of David Fernandez indicated, the stormwater management program also expressly includes the City's work in obtaining and maintaining an MS4 National Pollutant Discharge Elimination System permit. The MS4 is a national permit issued by the State Department of Environmental Protection through authority delegated to it by the Federal Environmental

37

Protection Agency. It is through this permit that the State and the federal government largely monitor and control stormwater discharge issues in the state and national waters surrounding the City. The City's MS4 permit is a legally authorized, and apparently legally required, element of the City's stormwater management program: "local governments shall cooperatively implement on a watershed basis a comprehensive stormwater management program . . . implemented through . . . the National Pollutant Discharge Elimination System stormwater program." Fla. Admin. Code R. 62-40.431(3).

The City's possession of the MS4 permit and the nonstructural citywide stormwater anti-pollution services benefit all ratepayers, like the Hospital, Golf Course, and Association, who discharge stormwater runoff. The undisputed testimony of witnesses like Eric Livingstone and David Fernandez was that if the quality of the waters receiving the stormwater runoff drops below a certain level due to stormwater discharge, and the City's nonstructural citywide services are not accepted as sufficient efforts at remediation, the ability of the City and other permit holders like the landholders to discharge stormwater into the state and national waters will be curtailed, which, in turn, will impact the use of lands and costs involved in discharging runoff. The majority opinion misreads Livingston's testimony by suggesting that he stated the Hospital, Golf Course, and Association's runoff would not be curtailed. Livingston testified to no such thing.

38

Livingston merely testified that the runoff from other properties might be curtailed first. Livingston's testimony can only be read to mean that, while the Hospital, Golf Course, and Association's runoff would not be curtailed first, it would certainly be curtailed next. Thus, he never refuted the testimony of other witnesses that the Hospital, Golf Course, and Association benefited from the use of utility fees to fund the MS4 permit.

In terms of the pollution control aspects of the program, the Hospital, Golf Course, and Association clearly contribute to the need for the stormwater anti-pollution services by discharging runoff into the City's salt marsh, which then flows into the Gulf. While their runoff is not treated by the City, the larger program of the City includes many other federal and state required stormwater anti-pollution services that protect the quality of the water that touches and surrounds the landholders' properties. The City's program also allows the landholders to avoid more onerous and expensive treatment for their runoff under applicable state and local laws. Thus, the stormwater anti-pollution services are something to which the landholders contribute (by discharging runoff) and are also something from which they specially benefit.

The majority opinion attempts to evade the plain legal consequences of these facts and this law by asserting that these citywide stormwater anti-pollution services benefit the public generally and should be paid by taxes. This statement is

39

wrong as a matter of public policy and law. The Florida Supreme Court has already held that the use of a tax to fund similar remediation programs caused by stormwater runoff is unsound public policy because it shifts the cost of paying for the programs necessitated by stormwater runoff from the landholders who generate stormwater runoff to others who did not generate the runoff. Sarasota Cty. v. Sarasota Church of Christ, Inc., 667 So. 2d 180, 182 (Fla. 1995) ("To require that the stormwater utility services be funded through a general ad valorem tax, as requested by the religious organizations who filed this action, would shift part of the cost of managing the stormwater drainage problems, which are created by developed real property, to undeveloped property owners who neither significantly contributed to nor caused the stormwater drainage problems.").

More importantly, however, it is for the legislature, not for the courts, to decide such public policy. And the legislature has already decided. The legislature has already decided that cities are authorized to fund these stormwater anti-pollution management programs from utility fees charged to landholders whose properties generate stormwater runoff. See §§ 403.0891(3), .031(17); Fla. Admin. Code R. 62-40.431(3). Whether or not the majority opinion agrees with the legislature's public policy to fund these services through utility fees is of no moment. It was clearly within the province of the legislature to authorize stormwater utility fees to pay for programs caused by stormwater runoff. The

40

majority opinion improperly assumes a legislative function when it replaces the legislature's public policy choice that these stormwater services should be funded by utility fees with its own suspect public policy choice that these stormwater services should be funded by taxes. The role of the courts is to apply legislatively created public policy, not to supplant it.

3. **The majority opinion usurps the legislature's discretion to set utility rates.**

This discussion brings us to the final error in the majority opinion. This case is not really about whether the Hospital, Golf Course, and Association contribute to the need for or benefit from the City's stormwater management program. They do. This case is really about whether these ratepayers on North Stock Island should be charged a lower rate than the ratepayers on the main island of Key West. So this is a case about the level of the utility rate. But "the establishment of utility rates is generally a legislative function." City of Gainesville, 863 So. 2d at 147. The majority opinion usurps the legislature's discretion when it replaces the legislature's choice regarding how the rates for these stormwater fees should be set with its own choice.

The extraordinary manner in which the majority opinion usurps the legislature's discretion to set rates is particularly obvious in light of City of Gainesville. In that case, a ratepayer claimed a city's stormwater utility fee was "not based on the amount of stormwater a customer contributes to the system" – an

41

argument identical to the one made in this case. Id. at 143. The method of calculating the stormwater fee—based on a property's impervious surface area with exemptions for undeveloped properties and properties that retained their stormwater—was identical to the method used in this case. The Florida Supreme Court upheld this method, noting that the legislature is acting within its discretion when setting rates and that "[s]ection 403.0891(6), Florida Statutes, expressly authorizes this method of apportioning cost." Id. at 147.

The trial court attempted to distinguish City of Gainesville on the basis that the Florida Supreme Court acknowledged that the University of Florida was properly not charged a fee because the "campus drains into a lake for which the University provides all stormwater management services." Id. at 142. But here, the landholders' properties drain into the salt marsh for which the City provides all stormwater management services. The majority opinion attempts to distinguish City of Gainesville by contending the landholders here do not "use" the stormwater management program or benefit from the program. As discussed above, this contention is based on the majority opinion's crabbed understanding of "use" and outright failure to credit the benefits of the citywide stormwater anti-pollution services which the legislature authorized to be funded by the utility fees. I cannot find a logical way to distinguish City of Gainesville, which, for all legal intents and

42

purposes, is on all fours with the instant case. The majority opinion directly and expressly conflicts with City of Gainesville.

In setting aside the method of establishing rates adopted by the City, authorized by the legislature, and approved by the Florida Supreme Court because "[s]ection 403.0891(6), Florida Statutes, expressly authorizes this method of apportioning cost," 863 So. 2d at 147, the majority opinion fails to even credit the costs of the City's nonstructural citywide stormwater anti-pollution services funded by the utility fees. Without crediting these costs and benefits, the majority opinion pronounces the utility fee to be arbitrary. It seems to me that setting aside a legislatively authorized utility fee, without crediting the benefits that the legislature authorizes and requires to be funded by the fee, is arbitrary. The majority opinion errs in the manner it usurps the legislature's discretion to establish utility rates.

CONCLUSION

The City was well within its discretion to calculate stormwater utility fees in the manner it did. Adjustments to those rates to make them fairer should be left to the legislative process. The law recognizes that it is extremely difficult, if not impossible, to establish a perfectly fair and accurate method of assessing these types of stormwater charges. For this reason, the law recognizes that the legislature is given broad discretion in setting such fees. While the City may well have had the

43

discretion to charge the Hospital, Golf Course, and Association a lower rate, it certainly would not have discretion to exempt these landholders altogether as the majority opinion has done. The majority opinion simply shifts the costs of the City's stormwater management program that benefit the Hospital, Golf Course, and Association to other ratepayers, the mirror image of the unfairness to which the Hospital, Golf Course, and Association originally complained. Accordingly, I respectfully dissent.