596 So.2d 1164 (1992)
CITY OF RIVIERA BEACH, a municipality and political subdivision of the State of Florida organized under the Laws of the State of Florida, Appellant,
v.
MARTINIQUE 2 OWNERS ASSOCIATION, INC., Appellee.
No. 90-3325.
District Court of Appeal of Florida, Fourth District.
April 1, 1992.
Rehearing Denied April 27, 1992.
John N. Buso and Arne C. Vanstrum of John N. Buso, P.A., West Palm Beach, and Andrew DeGraffenreidt, III, City Atty., Riviera Beach, for appellant.
Phillip C. Gildan of Nason, Gildan, Yeager, Gerson & White, P.A., West Palm Beach, for appellee.
FARMER, Judge.
The City of Riviera Beach provides solid waste removal services for its residents. Its rate structure includes both a container rate and one based upon each "residential unit". For multiple residence buildings, such as condominiums, it charges the greater of the container rate or the charge for each residential unit. After a certificate of occupancy is issued, it charges for this service regardless of whether there is any waste to be removed or whether the residence is actually occupied.
Martinique 2 is a luxury, oceanfront condominium development on Singer Island. Although the building was finished in November 1986, only 152 of its 220 units were actually occupied or capable of being occupied at the time of the final disposition below. When the building was originally *1165 completed, the developer voluntarily asked the city for  and was granted  a certificate of occupancy [CO] for the entire building. Only 17 units had then been sold and occupied. The original developer has long since failed and the project and building were taken over by the lender and since by a new group of investors.
The record does not establish the extent to which the unsold and unoccupied units were finished when the CO was issued. We are told by one of the parties that in the unfinished units toilet fixtures, kitchen appliances, electrical fixtures, floor and wall treatments were all left undone so that the ultimate buyer could then decide on the "upgrades" for the unit being purchased. Some of the units, however, were not sold to occupiers but to investors who, in turn, postponed selecting the optional "upgrades" until they could resell or "flip" the unit.
From the time of the CO, the city has charged for waste removal services at this condominium at its per residential unit rate instead of its cheaper container rate. Originally it supplied four 2-cubic-yard containers, and later added another three as more units became occupied. In other words, at first 17 owners, in effect, paid for the removal of waste from 220 units, more than 200 of which had no waste to remove. From the time of the CO, the residents paid these charges without objection.
In 1988, however, the owners asked the city for relief, particularly for a change to a container rate instead of the "living unit" rate. When the city declined after hearings before the city council, the unit owners brought this action for a refund of what they argued were overcharges or "phantom" charges. The trial judge granted a summary judgment in their favor.
He found that section 180.13(2), Florida Statutes (1989), required that the city's rates be just and equitable. Finding further that the unfinished/unoccupied units could not be considered "living units" because they did not qualify as such under the city's housing code, he concluded that the only "just and equitable" charge which the law allows is the container rate. He entered a final money judgment against the city for $78,345.79, a figure that included prejudgment interest, and enjoined the city from charging for those units "that have not been sold or finished for occupancy."
We reverse. Whether to charge a condominium building for waste collection and removal on the basis of how many containers are necessary or on the basis of how many residential units there are in the building is a legislative judgment for the city to make. § 180.13(1), Fla. Stat. (1991). On the basis of the record before us, we are unable to say that the amount or form of the city's charges is arbitrary, unreasonable or invidiously discriminatory.
Local ordinances must be read to give effect to the intention of the local legislative body. Rinker Materials Corp. v. City of North Miami, 286 So.2d 552 (Fla. 1973). We know of no legal reasons why a city could not charge large residential buildings on the basis of each living unit, if that is its legislative decision, rather than by the number of outdoor, refuse containers necessary to service the building. Nor does this record betray why the city should not be able to charge the greater of the two, if it has provided by ordinance as here that that is what it will charge. We certainly can see nothing inherently unjust or inequitable in charging on the basis used here.
The term "just and equitable" as used in section 180.13(2) is a brake primarily on the legislative rate-making, not on later judicial review. That is to say, the cities are given broad authority to establish their own rates for municipal utilities' charges. The amount or form those rates take in a representative democracy is something that is left to a civically vigilant electorate. Judicial deference to the legislative will requires a rule of review of utility rates such that it is only when the rate is so excessive as to be entirely unjustifiable  i.e., when the rate is arbitrary, unreasonable or invidiously discriminatory  that a court should enjoin enforcement. We cannot say that Riviera Beach's rates fit within that rule.
Although the city's rate uses the term "residential unit" to describe the alternative *1166 used to the container rate, the trial judge found no definition of that term in the ordinance he was construing and so looked to the building code. There he seized upon the term "dwelling unit," which the building code defines as a single unit providing complete, independent living facilities for one or more persons, including provisions for living, sleeping, eating, cooking and sanitation. He then found that the unfinished units lack some or more of these facilities because plumbing fixtures and toilet fixtures were not provided and were instead left for the initial occupier to supply. Hence, he reasoned, as these unfinished units could not qualify as "dwelling units" under the building code, so they must also not qualify as residential units under the solid waste ordinance.
We respectfully disagree with the trial judge. His analysis amounts, we think, to an essential rewriting of the ordinance he was construing. The law in this state has long been that if the city has acted unfairly or unwisely in adopting this kind of ordinance, the remedy is action by the legislative body of the city, not legislative action by the courts. Williams v. City of Jacksonville, 118 Fla. 671, 160 So. 15 (1935); see also Holley v. Adams, 238 So.2d 401 (Fla. 1970).
Even if this ordinance were apparently or arguably unjust or inequitable, the city would still have to be given broad leeway to establish the propriety of the ordinance by facts demonstrating a reasonable basis for its rate scheme. That would virtually preclude the summary determination the court used here. The city would have to be given an opportunity to provide a detailed factual background and justification for the rate scheme it did adopt. That kind of presentation can be done only in a full blown trial on the merits, not in the quite limited setting of a hearing on a motion for summary judgment.
We stress that we are unable to find even a prima facie showing in this record that the ordinance is improper. That the city charges for units from which no solid waste is removed, and more is charged for individual units than would have been charged if only the container rate was used, does not in and of itself make a showing that the rates are unjust or inequitable  or as we have earlier suggested that they are excessive.
To some extent it was the original developer who precipitated the unit owners' problem by seeking a CO for the entire building when few of the units were sold or actually ready for occupancy. Meanwhile, the city is required  all the while these units remain "unfinished" and unoccupied  to maintain the capacity and equipment to remove solid waste from all of them tomorrow. The city cannot be enjoined under the rubric of just and equitable rates to subsidize the vicissitudes of the marketplace for luxury, oceanfront condominiums by bearing the cost of the full 220-unit capacity and charging for only the few that are occupied.
We therefore reverse the trial court's summary judgment and remand for proceedings not inconsistent with the views we have expressed.
REVERSED AND REMANDED.
LETTS and WARNER, JJ., concur.