# Third District Court of Appeal

## State of Florida

Opinion filed May 31, 2017.

THIS OPINION IS NOT FINAL UNTIL DISPOSITION OF ANY FURTHER
MOTION FOR REHEARING AND/OR MOTION FOR REHEARING EN
BANC. ANY PREVIOUSLY-FILED MOTION FOR REHEARING EN BANC
IS DEEMED MOOT.

_____

No. 3D13-57
Lower Tribunal No. 09-822-K

_____

## City of Key West,

Appellant/ Cross-Appellee,

vs.

## Key West Golf Club Homeowners', etc., et al.,

Appellees/Cross-Appellants.

An Appeal from the Circuit Court for Monroe County, David J. Audlin, Jr.,
Judge.

Johnson, Anselmo, Murdoch, Burke, Piper & Hochman, P.A., and Michael
T. Burke and Hudson C. Gill (Fort Lauderdale), for appellant/cross-appellee.

Smith Oropeza, P.L., and Barton W. Smith and Ashley N. Sybesma, for
appellees/cross-appellants.

Before SALTER, EMAS, and LOGUE, JJ.

ON MOTION FOR REHEARING

LOGUE, J.

This case comes before us on rehearing. We grant rehearing, withdraw our previous opinion, and issue this opinion in its stead.[1]

Key West Golf Club Homeowners' Association, Inc. (Association), Key West Golf Club, LLC (Golf Course), and Key West HMA, LLC (Hospital) brought suit seeking a declaration that the City of Key West's stormwater utility fee was illegal as applied to their properties. After a bench trial, the court agreed and entered a judgment exempting the properties from future stormwater utility fees. We reverse.

The undisputed record at trial reveals that the Association, Golf Course, and Hospital contributed to the need for the stormwater utility by discharging stormwater. They also benefited from both the stormwater utility's flood control and pollution control measures. While the trial court apparently found that the amount of the fee had no reasonable relationship to the benefits received, it

---

[1] The Appellant, City of Key West, filed a motion for rehearing en banc of the original panel opinion. When a motion for rehearing en banc is unaccompanied by a motion for rehearing, our Internal Operating Procedures require the motion for rehearing en banc to be treated as including a motion for rehearing which must be ruled upon by the panel. Wade v. State, 57 So. 3d 993, 994 (Fla. 3d DCA 2011). The Supreme Court has approved this policy. Romero v. State, 870 So. 2d 816, 818 (Fla. 2004) ("By treating motions for rehearing en banc as including motions for rehearing, the Third District adheres to the spirit of Florida Rule of Appellate Procedure 9.040(d).").

considered only the costs of the flood control measures and failed to consider the substantial, City-wide stormwater anti-pollution services which comprise a large part of the stormwater management system at issue. In <u>City of Gainesville v. State</u>, 863 So. 2d 138, 145 (Fla. 2003), the Florida Supreme Court upheld a method of establishing stormwater fees virtually identical to the method used here by the City. For these reasons, we hold that the City acted within its lawful authority by subjecting the properties to the stormwater utility fees.

FACTS

The State has authorized municipalities to create stormwater utilities in order to fund stormwater management. <u>See</u> §§ 403.0891, .0893, 163.3202(d), Fla. Stat. (2001). The purpose of these laws is to control flooding and to prevent pollution—the latter being deemed by the Legislature as "a menace to public health and welfare." <u>See</u> § 403.021(a). The need to mitigate the effects of stormwater discharge is particularly heightened in the municipality of Key West. It is part of the Florida Keys which the Legislature has designated "as an area of critical state concern" in order to, among other things, "[p]rotect and improve the nearshore water quality." § 380.0552 (2)(i) & (3), Fla. Stat.

In 2001, the City established a stormwater utility as authorized by Chapter 403 of Florida Statutes. <u>See</u> Key West, Fla. Code § 74.365. One purpose of the utility was to improve "the water quality in the stormwater and surface water

3

system and its receiving waters." Key West, Fla. Code § 74.362. Tracking the ordinance upheld in <u>City of Gainesville</u>, the fee at issue is based on the amount of impervious surface area, such as buildings and parking lots, on a property. A larger impervious surface area results in a higher utility fee because the larger such areas, the less stormwater is absorbed into the ground and the more stormwater is discharged. The ordinance exempts certain property, including property that retains its stormwater runoff.[2] The ordinance establishes a sliding scale for the amount of the utility fee based upon the amount of water retained on site.[3] The fees do not go into the general fund, but are segregated in a separate account dedicated to plan, construct, operate, and maintain the City's stormwater management system on a city-wide, unitary basis for present and future needs.

---

[2] "Exempt property means public rights-of-way, public streets, public alleys and public sidewalks, public parks, undisturbed property, conservation areas and easements; any property on which is retained 100 percent of the total volume of runoff within the property (measured on the basis of a 72-hour, 100-year storm event); and any property owned by the U.S Navy which by agreement with the City is deemed exempt."  Key West, Fla. Code § 74.361.

[3] If a property is able to collect and retain 100% of the water on its property from a 100-year storm for a period of 72 hours, then that property will be exempt from paying the stormwater utility fee.  Additionally, Section 74.365 of the Code provides for reductions in the stormwater utility fee: if a property owner is able to retain 100% of the water runoff of a 25-year storm event for a period of 72 hours, that property owner may receive a 15% reduction of their user fees. If the property owner is able to collect and retain 100% of the stormwater runoff of a 50-year storm for a period of 72 hours, then it is eligible to receive a 25% reduction of its user fees.

In 2003, the City began billing the Association, Golf Course, and Hospital for the stormwater utility fee. In 2009, the Association, Golf Course, and Hospital filed suit against the City, essentially claiming that they received little or no benefit from the stormwater utility.

The Association, Golf Course, and Hospital are located on Stock Island, which is immediately east of the island of Key West. Stock Island is bisected by US Highway 1 (US 1). The portion of Stock Island north of US 1 is within the municipal boundaries of the City of Key West. The main road providing access to the northern portion of Stock Island is College Road. College Road forms a horseshoe-shaped loop which generally runs along the water's edge on the perimeter of northern Stock Island. Each end of the loop intersects US 1.

Enclosed within the loop formed by College Road are all or part of the properties of the Association, Golf Course, and Hospital and also a tidal salt marsh. The submerged land under the salt marsh is largely owned by the City, although part is leased to the Golf Course and part is owned by the Hospital. The Association, Golf Course, and Hospital properties have injection wells, retention ponds, and catch basins. They stipulated, however, that the properties did not retain stormwater at levels that would qualify them for a fee exemption or reduction under the ordinance. Instead, they discharge stormwater into the salt marsh or

5

Gulf. The water discharged into the salt marsh drains out to the Gulf of Mexico by means of seven culverts cut through College Road.

At trial, the undisputed testimony of numerous witnesses was that without the seven culverts that allow the salt marsh to flow into the Gulf, the salt marsh would back up and the Association, Golf Course, and Hospital properties would flood. In addition, without the culverts and also the storm drains and outlets along College Road that divert stormwater coming onto the road into either the salt marsh or directly into the Gulf, College Road would flood and access to the landowners' properties would be blocked.

There was conflicting evidence as to whether the culverts, storm drains, and outlets that provided the drainage constituted part of the City's stormwater system. On this crucial point, however, the trial court found for the City and against the Association, Golf Course, and Hospital. As expressly found by the trial court, "[t]he City of Key West controls and maintains a stormwater system on North Stock Island." Key West Golf Club Homeowners' Assoc. v. City of Key West, Order Declaring Section 74.365 Illegal, Case no. 2009-CA-822-K at 20 (Fla. Cir. Ct. Nov. 9, 2012). This system, the trial court determined, "consist[s] of catch basins, culverts, and pipes carrying water from the basins to the salt marsh and then to the Gulf of Mexico, or to the Gulf directly." Id. at 7. The Association, Golf Course, and Hospital do not challenge this finding.

6

The undisputed testimony also indicated that the City's stormwater management system provides a host of citywide stormwater anti-pollution services. These citywide services include flood and pollution control education, storm drain stenciling, a stormwater hotline (to report polluters using storm drains), testing for illicit discharges into the storm drains, mandatory intergovernmental coordination regarding water quality for the watersheds and basins in which the City is located, water monitoring, and enacting and enforcing an ordinance requiring compliance with Florida Department of Environmental Protection and South Florida Water Management District rules and regulations. Stormwater runoff necessitates these services. These services are legally authorized to be part of the stormwater management program funded by the utility fees: "Stormwater management programs shall use a combination of nonstructural and structural best management practices . . . ." Fla. Admin. Code R. 62-40.431(3) (emphasis added).

As the undisputed testimony of one city official indicated, the stormwater management program also includes the City's work in obtaining and maintaining an MS4 National Pollutant Discharge Elimination System permit. The MS4 is a national permit issued by the State Department of Environmental Protection through authority delegated to it by the Federal Environmental Protection Agency. It is through this permit that the State and the federal government largely monitor and control stormwater discharge issues in the state and national waters

7

surrounding the City. The City's MS4 permit is a legally authorized element of the City's stormwater management program: "local governments shall cooperatively implement on a watershed basis a comprehensive stormwater management program . . . implemented through . . . the National Pollutant Discharge Elimination System stormwater program." Fla. Admin. Code R. 62-40.431(3).

The evidence at trial indicated that the City's possession of the MS4 permit and the nonstructural citywide stormwater anti-pollution services benefit all ratepayers, like the Association, Golf Course, and Hospital, who discharge stormwater runoff. The undisputed testimony of a city official and of the property owners' own expert was that if the quality of the waters receiving the stormwater runoff drops below a certain level due to stormwater discharge, and the City's nonstructural citywide services are not accepted as sufficient efforts at remediation, the ability of the City and other permit holders like the Association, Golf Course, and Hospital to discharge stormwater into the state and national waters will be curtailed, which, in turn, will impact costs involved in discharging runoff and might ultimately impact the use of the lands.[4]  Moreover, the

[4] The testimony of the property owners' own expert, David Livingston, cannot be read to suggest he stated the Association, Golf Course, and Hospital's stormwater discharges would not be curtailed.  The expert merely testified that the discharges from other properties might be curtailed first. This testimony can only be read to mean that, while the Association, Golf Course, and Hospital's runoff would not be curtailed first, it would certainly be curtailed subsequently. Thus, he never refuted the testimony of other witnesses that the Association, Golf Course, and Hospital benefited from the use of utility fees to fund the MS4 permit.

8

undisputed testimony indicated that the City's stormwater utility plans include both the installation of new headwalls and aprons at the outfalls to prevent mangrove growth and allow easier maintenance in the future and the retrofitting of the College Road street inlets with water quality inserts that will reduce and prevent pollution contained in the stormwater discharges.

The evidence also reflected that no stormwater from the properties of the Association, Golf Course, or Hospital travels to the Island of Key West for wastewater treatment. And although no amount was quantified, the City spent relatively small amounts of money maintaining its anti-flood system of culverts, storm drains, and outlets which drain the waters on College Road and the salt marsh.

At the end of trial, the trial court found that the Association, Golf Course, and Hospital were non-users or minimal users of the stormwater utility. It refused to order a refund of previously paid stormwater fees, but it exempted the properties from future charges. The City appealed and the Association, Golf Course, and Hospital cross-appealed.

## ANALYSIS

### 1. Can these properties be subject to any stormwater utility fee?

The first issue presented by this case is whether the City can lawfully charge the Association, Golf Course, and Hospital any stormwater utility fees at all. Here,

9

the undisputed record at trial shows that Association, Golf Course, and Hospital contribute to the need for the stormwater utility by discharging stormwater, and they benefit from both the stormwater utility's flood control and pollution control measures.

A stormwater utility fee is a special type of user fee. User fees must be voluntary in the sense that a payer must be able to avoid the fee by declining the benefit. City of Gainesville, 863 So. 2d at 144. The law is well established, however, that a property owner elects to pay a stormwater utility fee when it elects to discharge stormwater rather than retain it. "Properties that are either undeveloped or implement ways to retain all stormwater on site are exempted. Therefore, property owners can avoid the fee either by not developing the property or by implementing a system to retain stormwater on site." Id. at 146. Here, the Association, Golf Course, and Hospital could elect to remove themselves from the ambit of the utility's services by refraining from discharging stormwater runoff. They cannot however, elect to discharge stormwater runoff and also refuse to pay for the programs which the legislature has determined are necessary to mitigate the "flooding, overdrainage, environmental degradation and water pollution" generated by the discharges. See generally §403.031(16).

Like similar statutes, the statute at issue authorizes stormwater utility fees to be paid based upon a ratepayer's contribution to the need for, and benefit from, the

10

stormwater utility. See, e.g., §403.031(17) (defining "stormwater utility" as "the funding of a stormwater management program by assessing the cost of the program to the beneficiaries based on their relative contribution to its need" (emphasis added)). Following this law, the Florida Supreme Court has held, "beneficiaries" of a municipal stormwater utility "can be charged." City of Gainesville, 863 So. 2d at 145. To decide if the Association, Golf Course, and Hospital can be charged a utility fee, we must decide if they contribute to the need for and benefit from the stormwater management system established by the stormwater utility.

"[T]he objective of a stormwater management system is to prevent or reduce flooding and pollution." City of Gainesville, 863 So. 2d at 140. See §403.031(16) (defining "[s]tormwater management system" as "a system which is designed and constructed or implemented to control discharges which are necessitated by rainfall events, incorporating methods to collect, convey, store, absorb, inhibit, treat, use, or reuse water to prevent or reduce flooding, overdrainage, environmental degradation and water pollution or otherwise affect the quantity and quality of discharges from the system.").

The trial court did not make an express finding that the Association, Golf Course, and Hospital do not benefit from the stormwater anti-flooding system. Any such finding would not be supported by the record. The undisputed evidence at trial reflected that the stormwater discharge from their properties would cause the

11

salt marsh to back up and flood their properties were it not for the drainage provided by the culverts, storm drains, and outlets which the trial court expressly found were part of the City's stormwater management infrastructure. The record thus reflects that the Association, Golf Course, and Hospital benefit as landowners from the anti-flooding stormwater management program: they gain access to and use of their land which would otherwise flood. This benefit is completely different from any ancillary benefit provided to the general public which could avoid the flooded road and properties.

Moreover, the trial court failed to credit the extensive and undisputed testimony that the Association, Golf Course, and Hospital benefited from the citywide stormwater anti-pollution services funded by the utility fees. Measures to mitigate the pollution and water degradation caused by stormwater discharges are central to the legislature's purpose in authorizing the creation of stormwater utilities. See §403.031(16).

In terms of the pollution control aspects of the program, the Association, Golf Course, and Hospital contribute to the need for the stormwater anti-pollution services by discharging runoff into the City's salt marsh, which then flows into the Gulf. While their runoff is not treated by the City, the larger program of the City includes many other federal and state required stormwater anti-pollution services that protect the quality of the water that touches and surrounds their properties. The

12

City's program also allows the landowners to avoid more onerous and expensive treatment for their runoff under applicable state and local laws. Thus, the stormwater anti-pollution services are components of the stormwater management system necessitated by their actions (discharging runoff) and are also something from which they specially benefit.

In their brief, the Association, Golf Course, and Hospital attempt to evade the legal consequences of these conclusions by asserting that these citywide stormwater anti-pollution services benefit the public generally and should be paid by taxes. They argue: "improved water quality is yet another general benefit shared by all of the public, not a specific benefit bestowed exclusively upon payers of the [City's] stormwater utility fee." This statement is wrong both as a matter of public policy and law.

Regarding public policy, the Florida Supreme Court has held that the use of a tax to fund remediation programs caused by stormwater runoff is unsound because it shifts the cost of paying for the programs necessitated by stormwater runoff from the landholders who generate stormwater runoff to others who did not generate the runoff. Sarasota Cty. v. Sarasota Church of Christ, Inc., 667 So. 2d 180, 182 (Fla. 1995) ("To require that the stormwater utility services be funded through a general ad valorem tax, as requested by the religious organizations who filed this action, would shift part of the cost of managing the stormwater drainage

13

problems, which are created by developed real property, to undeveloped property owners who neither significantly contributed to nor caused the stormwater drainage problems."). Although Sarasota County focused on drainage problems created by stormwater discharges, the same reasoning applies with equal force to pollution and water degradation caused by stormwater discharges.

More importantly, the legislature has enacted a law that authorizes municipalities to fund these stormwater anti-pollution management programs from utility fees charged to landholders whose properties generate stormwater runoff. See §§ 403.0891(3), .031(17); Fla. Admin. Code R. 62-40.431(3). Whether or not a court agrees with the legislature's public policy to fund these services through utility fees is of no moment. It is within the province of the legislature to authorize stormwater utility fees to pay for programs necessitated by stormwater runoff. The Association, Golf Course, and Hospital improperly ask us to usurp a legislative function when they contend we should replace the legislature's public policy choice that these stormwater services should be funded by utility fees with their own suspect public policy choice that these stormwater services should be funded by taxes. In City of Gainesville, the Florida Supreme Court repeatedly cited with approval to cases holding that stormwater utility fees and similar statutorily authorized municipal utility fees were not taxes. 863 So. 2d at 145-46.

14

Finally, the trial court attempted to distinguish <u>City of Gainesville</u> on the basis that the Florida Supreme Court held that the University of Florida was properly not charged a fee because the "campus drains into a lake for which the University provides all stormwater management services." <u>Id.</u> at 142. Here, however, the stormwater from the properties of the Association, Golf Course, and Hospital drain into the salt marsh for which the City provides all stormwater management services. And the undisputed testimony indicated that, without the drainage provided by the culverts, which the trial court expressly found was part of the City's stormwater infrastructure, the stormwater discharged from the Association, Golf Course, and Hospital properties would back up and flood the properties. Because there is no principled way to distinguish <u>City of Gainsville</u>, we hold it was within the lawful authority of the City to charge these properties a utility stormwater fee.

**2. Does the stormwater utility fee bear a reasonable relationship to the benefits conferred?**

The second issue presented is whether the fee charged bears a reasonable relationship to the benefits received. This discussion brings us to the crux of this case. This case is not really about whether the Association, Golf Course, and Hospital contribute to the need for or benefit from the City's stormwater management program. They do. This case is really about whether these ratepayers

15

on North Stock Island should be charged a lower rate than the ratepayers on the main island of Key West. So this is a case about the level of the utility rate.

On this point, the Florida Supreme Court has held that "the establishment of utility rates is generally a legislative function." City of Gainesville, 863 So. 2d at 147. Indeed, "the creation of a statutorily-authorized utility strongly favors the validity of the fees imposed." Id. at 145.

In City of Gainesville, a ratepayer claimed a city's stormwater utility fee was "not based on the amount of stormwater a customer contributes to the system" – an argument identical to the one made in this case. Id. at 143. The method of calculating the stormwater fee—based on a property's impervious surface area with exemptions for undeveloped properties and properties that retained their stormwater—was identical to the method used in this case. The Florida Supreme Court upheld this method, noting that the legislature acts within its discretion when setting rates and that "[s]ection 403.0891(6), Florida Statutes, expressly authorizes this method of apportioning cost." Id. at 147. We believe this case falls squarely within the holding of City of Gainesville.

While the trial court apparently believed that the fee charged had no reasonable relationship to the benefits received, it considered only the costs of the flood control measures and failed to consider the substantial, City-wide stormwater anti-pollution measures that benefit these properties.

16

In emphasizing that none of the stormwater discharge from their properties travels through the stormwater infrastructure located on the island of Key West, the Association, Golf Course, and Hospital appear to argue that a ratepayer benefits from a statutorily authorized stormwater management system only to the extent that its stormwater travels through the utility's pipes and infrastructure. We reject this view for several reasons.

First, a stormwater utility funds more than infrastructure. In fulfilling their mission to mitigate the "environmental degradation and water pollution" generated by stormwater discharges, §403.031(16), "[s]tormwater management programs shall use a combination of nonstructural and structural best management practices . . . ." Fla. Admin. Code R. 62-40.431(3) (emphasis added). The undisputed testimony at trial indicated that these practices included many pollution control services listed previously in this opinion. Stormwater runoff necessitates these services and these services are legally authorized to be part of the stormwater management program funded by the utility fees. See, e.g., Fla. Admin. Code R. 62-40.431(3) ("[L]ocal governments shall cooperatively implement on a watershed basis a comprehensive stormwater management program . . . implemented through . . . the National Pollutant Discharge Elimination System stormwater program."). The argument of the Association, Golf Course, and Hospital fails to take into account these essential components of the stormwater management program.

17

Moreover, the governing cases and statutes direct that the analysis of "use" in regards to a statutorily authorized stormwater or sewer utility focus on whether the ratepayer contributes to the need for and benefits from the utility, not whether the sewage or stormwater from a particular property travels through a particular pipe. See, e.g., §403.031(17) (defining "stormwater utility" as "the funding of a stormwater management program by assessing the cost of the program to the beneficiaries based on their relative contribution to its need" (emphasis added)); City of Gainesville, 863 So. 2d at 145 (holding "beneficiaries" of a municipal stormwater utility "can be charged"). In City of Gainesville, when upholding a stormwater utility fee virtually identical to the one at issue here, the Florida Supreme Court cited with approval a long line of cases holding that a utility fee was legally imposed when a landowner benefited from the existence of the utility whether or not its sewage or solid waste actually entered into the utility's infrastructure.[5]

---

[5] City of Gainesville, 863 So. 2d at 146 (citing State v. City of Miami Springs, 245 So. 2d 80 (Fla. 1971) (holding that a municipality may charge a mandatory fee for sewer service unrelated to whether sewage from particular property entered pipes); Town of Redington Shores v. Redington Towers, Inc., 354 So. 2d 942 (Fla. 2d DCA 1978) (holding that the subject sewer fee applied to unoccupied condominiums); Stone v. Town of Mexico Beach, 348 So. 2d 40 (Fla. 1st DCA 1977) (upholding a mandatory flat rate for garbage service, regardless of use); City of Riviera Beach v. Martinique 2 Owners Ass'n, 596 So. 2d 1164 (Fla. 4th DCA 1992) (holding that the subject solid waste removal ordinance applied to unoccupied condominiums without regard to actual use).

If adopted as the law of Florida, the argument of the Association, Golf Course, and Hospital in this regard would allow a utility ratepayer to chop a utility into component parts and obtain a judicial rate reduction based only on the parts of the system it "used." So, for example, a sewer utility ratepayer located near a water treatment plant could contend it used only the pipes and pumping stations between its property and the plant because its sewage makes its way only into those pipes. It could object to paying rates to support pipes and infrastructure farther from the plant than its own property because its sewage does not make its way into those pipes. Properly understood, the argument of the Association, Golf Course, and Hospital in this case is no more than a variation on this theme.

Ad hoc judicial utility rate adjustments based on the balkanization of utility infrastructure like that proposed by the Association, Golf Course, and Hospital invites abuse because they fail to account for the need to have such systems operate as part of a cohesive, unitary, regional whole. In the long run, judicial utility rate adjustments will generate more unfairness than the current legislative ratemaking process whose broad and realistic perspective allows consideration of the effect of a rate change on all ratepayers, not just the ratepayers who happen to be before the court.

No system for setting stormwater utility rates is perfect. The trial court's decision, however, simply shifts the entire future burden of the Association, Golf

19

Course, and Hospital's share of the costs of the City's stormwater management program to the remaining ratepayers. This is the mirror image of the unfairness of which the Association, Golf Course, and Hospital originally complained.

CONCLUSION

The City was well within its discretion to calculate stormwater utility fees as done here. It is extremely difficult, if not impossible, to establish a perfectly fair and accurate method of assessing these types of stormwater charges. For this reason, the legislature is given broad discretion in setting such fees. While the City may well have had the discretion to amend the ordinance and charge the Association, Golf Course, and Hospital a lower rate, it certainly would not have discretion under the existing ordinance to exempt these landholders altogether as the trial court did. This case is remanded with instructions to enter judgment for the City.

Reversed.